THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JACKIE RUSH, Defendant-Appellant.

First District (4th Division)   No. 76-486

Opinion filed October 26, 1978.

James Geis and Victoria J. Meyers; both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Myra J. Brown, and Richard J. Barr, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Defendant-appellant Jackie Rush was indicted for murder, convicted of that crime in a jury trial, and sentenced to a term of 60 to 100 years. On appeal he presents four contentions: (1) he was not proven guilty beyond a reasonable doubt, (2) the trial court abused its discretion by permitting the State to impeach defendant's trial testimony with his stricken testimony from the pretrial hearing on a motion to suppress evidence, (3) it was reversible error for the prosecutor to cross-examine defendant about his failure to deny the charge prior to trial and to argue to the jury that this failure created an inference of guilt, (4) defendant's sentence was excessive.

We affirm the judgment of the trial court.

On April 21, 1974, at about 2 a.m. the victim, Warstine Reese, was shot

and killed as he used the public telephone in a bar called Skipper's Lounge, located at 69th Street just off Racine in the city of Chicago. One half hour later the defendant was arrested about one block away, near the Chase Lounge. He was subsequently indicted for the murder of Reese.

The State presented the testimony of Charles Reed, an eyewitness to the murder. Reed arrived at Skipper's Lounge at midnight. There were 50 to 70 people inside, mostly in the back of the lounge where the dance floor was. Reed described the lighting as "pretty good" in front and "a little bit dark" further back. He was seated at a table near the front of the lounge along the east wall. There was a bar along the west wall. Also along the west wall was a pay telephone. While Reed was sitting in the booth, facing the west wall, he observed an individual using the pay phone, facing the back of the bar. About a foot and a half behind the individual at the phone Reed saw the defendant, whom he had known for 12 or 13 years. Defendant's arm was extended towards the phone user's head, about six inches away. A woman Reed knew as Brenda was three feet behind the defendant. Reed then heard a gun shot and saw a flash from defendant's arm. The man at the phone fell to the floor, defendant turned towards the front of the lounge and put a gun in his right front pocket as he ran out of the lounge with Brenda. Reed testified that there were no people blocking his view of the defendant at the time of the shooting. On cross-examination he explained that he had not previously related having seen a flash from defendant's arm because no one had asked him before.

The co-owner of the lounge testified that she also heard a shot and saw defendant and Brenda running. She recalled that there were about 50 people in the lounge at the time, most of them in the back. The lighting was dim, but was bright enough so one could see "everything and everybody."

Chicago police officers Thomas Quinn and John Solecki testified that they arrested the defendant at 68th Street and Racine in Chicago, about one block from the Skipper's Lounge and in the vicinity of the Chase Lounge. They were investigating a shooting which had taken place at the Chase Lounge earlier that evening. Brenda had been identified as the girlfriend of a suspect in that shooting, so when they saw her walking with the defendant they sought to question her. The officers were in plain clothes, traveling in an unmarked vehicle. They got out of the car, announced their office, and began to approach the two. Defendant pulled a gun out of his right front coat pocket and held it by his side. After being warned twice by the officers to drop the gun, he threw it two or three feet to his right. The weapon, a .357 magnum revolver, contained five live shells and one spent cartridge casing. A Chicago police officer from the firearms unit testified that the bullet recovered from the head of the

deceased was fired from the gun recovered from the defendant. A pathologist testified that the deceased was killed by a bullet wound to the head, fired from no more than a foot away.

In an effort to impeach the testimony of Charles Reed, defendant introduced the testimony of Charlotte Miller and Betty Rush. Betty Rush, defendant's mother, testified that Reed had told her he believed Brenda, not defendant, had done the shooting. Charlotte Miller, a friend of defendant's mother, recalled that Reed had told her he really did not know what happened. Reed in his testimony stated he had talked to these women but denied telling them he did not know what he saw.

Defendant testified that he was in Skipper's Lounge with Brenda at the time of the shooting. He was ordering a drink from the bar when he heard a shot. He ran outside, then began to walk home. When he met Brenda on the street he started to walk with her. They were approached by two officers who told him to get up against the fence and then searched him. One officer picked up a pistol which was 10 feet away from the defendant and did not belong to him. Defendant denied possessing a gun at Skipper's Lounge and denied shooting anyone.

Beatrice Allen, who considered herself a good friend of defendant's sister, testified that she witnessed defendant's arrest. The police jumped out of a car, said "freeze, Charles," and searched the defendant. One officer walked ten feet away and picked up a gun. She never saw defendant with a gun, but she also testified that when the officers drew their guns she fell to the ground and did not watch the defendant.

Chicago police officer Nick Crescenzo testified that he spoke to Investigator Quinn after defendant's arrest and Quinn told him defendant had "pulled a gun out on him." Crescenzo assumed at the time that Quinn meant the gun was pointed at him. However, Investigators Quinn and Solecki both denied telling Crescenzo that defendant pointed a weapon at them.

## I.

■■ This summary establishes that the evidence of the defendant's guilt was overwhelming. An eyewitness who had known the defendant for at least 12 years identified him as the one who had shot the deceased. Defendant was arrested near the lounge half an hour later with what was determined to be the murder weapon in his possession. Only defendant's testimony directly contradicted this evidence, and the jury was within its discretion in rejecting that testimony and accepting that of the eyewitness and the two police officers who arrested defendant. The State's evidence, clearly accepted by the jury, established defendant's guilt beyond any reasonable doubt.

## II.

However, defendant also contends that the trial court erred in permitting the State to impeach him with testimony he gave at a pretrial hearing on his motion to suppress certain evidence. In that hearing defendant was seeking to establish that his warrantless arrest was also made without probable cause and consequently was illegal. Defendant testified that he was walking near 68th and Racine with Brenda when they were stopped by two police officers. The police searched him and then picked up a pistol which had never been in his possession and arrested him for carrying a concealed weapon. Defendant also stated he was with Brenda "at all times" until the officers approached. On cross-examination, over defense objection, the State questioned defendant in detail concerning his activities earlier that evening up to the time of the arrest. Although the court allowed this examination, it indicated that if none of the testimony elicited was ultimately relevant to the issue of probable cause it would be stricken. The State established probable cause with the testimony of Officers Quinn and Solecki who stated that the defendant brandished a weapon when they sought to question him on the street. Accordingly, defendant moved to strike the testimony concerning his activities prior to the time of the arrest, and the trial court granted the motion "* * * as far as this motion [the motion to suppress] is concerned." Before defendant testified at trial the defense moved to bar the State from using any of this stricken testimony as impeachment. The court denied the motion and the State used that testimony to impeach defendant's trial testimony on the following points: when and where he first saw Brenda that night, what time he left the Chase Lounge, how long he talked to his friend Ben in Skipper's Lounge, just where at the bar he was when the shooting occurred, whether he was ordering a drink then or had ordered one three to five minutes earlier, and whether he entered a nearby restaurant after the shooting or just stood outside of it.

■■ Defendant concedes that if his testimony at the motion to suppress had been elicited by proper cross-examination it could then be used to impeach his trial testimony. Thus, he relies on the alleged impropriety of the cross-examination as the basis for asserting trial error. Specifically, defendant contends the State acted in bad faith in their examination of the defendant, seeking, in reality, to discover all they could from the defendant under the guise of cross-examination; an examination which defendant contends amounted to deposing the defendant. Such a deposition is, of course, not permitted by the rules of discovery relating to criminal cases. (Ill. Rev. Stat. 1975, ch. 110A, pars. 413, 414.) But defendant has not established that this was the purpose of the State's cross-examination. Defendant had testified that he was with Brenda at all times prior to the arrest. The State's cross-examination concerned his

earlier activities with Brenda. The trial court correctly struck this testimony when it determined, after the officers' testimony, that it was not the basis of probable cause for the arrest. But we do not find the analogy to an evidence deposition convincing. The defendant voluntarily took the stand in support of his motion, knowing he would be subject to cross-examination on his testimony. The trial court, in its discretion, allowed a wide-ranging cross-examination initially, but then struck that testimony for purposes of the motion to suppress when it determined that the subject matter was not relevant to the motion. This procedure did not amount to a forced deposition of the defendant; nor has defendant established bad faith on the part of the State in this cross-examination.

██ Defendant also contends that the State should not have been permitted to use this stricken cross-examination testimony to impeach him at trial because this would have a chilling effect on a defendant's Fourth Amendment right to testify on his own behalf in a motion to suppress. Defendant cites *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967. But in *Simmons* the court held only that the testimony of a defendant in support of a motion to suppress could not subsequently be used against him as evidence of guilt at trial. In *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643, the Supreme Court held that a defendant could properly be *impeached* with a statement taken from him in violation of his *Miranda* rights. The court stated that: "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury." (401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645.) The Illinois Supreme Court subsequently construed these two opinions to be in harmony and held that the testimony of a defendant voluntarily given by him in conjunction with his motion to suppress evidence could not be introduced by the State as part of its case in chief, but could be used to impeach the defendant if he testified at trial. (*People v. Sturgis* (1974), 58 Ill. 2d 211, 317 N.E.2d 545, *cert. denied* (1975), 420 U.S. 936, 43 L. Ed. 2d 412, 95 S. Ct. 1144.) This is what was done in the cause before us. Defendant's statements made in conjunction with his motion to suppress were used at trial only after he chose to testify, and then only for purposes of impeachment. Defendant suggests that his answers on cross-examination during the motion to suppress hearing were not voluntary as required by *Sturgis*. We reject the notion that a defendant who voluntarily testifies in connection with his motion to suppress can be said to be involuntarily testifying when he is cross-examined concerning that testimony. Voluntariness as used in this context has to do with the reliability of the evidence, such as might be of concern when a confession has been coerced. (*People v. Doss* (1975), 26 Ill. App. 3d 1, 324 N.E.2d 210.) We also note that it has long been held in Illinois

that testimony which has been stricken as incompetent in one proceeding may still be used to impeach the witness in a later proceeding. (*People v. Turner* (1914), 265 Ill. 594, 107 N.E. 162.) Indeed, the trial judge here specifically struck the defendant's testimony only insofar as the motion to suppress was concerned. Accordingly, we hold that the trial court did not err in permitting the use for impeachment purposes of the testimony it had stricken on the motion to suppress.

### III.

Defendant also contends that reversible error was committed when the State cross-examined him concerning his post-arrest silence and also commented on that silence in final argument to the jury. The defendant first testified to his silence on direct examination by his attorney. He related that when the police arrested him he asked what he was charged with and was told unlawful use of a weapon. His attorney then asked:

"Q. Incidentally, when they said, possession of a weapon, did you say anything to them?

A. No."

Defendant was taken to the police station and Charles Reed was brought in to see him. After relating this, defendant was asked, by his attorney:

"Q. You say you saw Charles Reed at the station?

A. Yes.

Q. And you have known him for a number of years?

A. Yes.

Q. Did you speak to Charles Reed?

A. No."

After Reed left, the officers informed defendant he was being charged with murder. At trial his attorney asked him:

"Q. What if anything did you say when he told you you were being charged with murder?

A. I just put my head down."

On cross-examination, over defense objections, the State was permitted to question defendant concerning this silence. First the prosecution elicited defendant's testimony that he failed to claim his innocence to Charles Reed and two other State witnesses, Geraldine Webb and Ella Owen, when he saw them at the police station:

"Q. And you saw Charles Reed and you put your head down, is that right?

A. Right.

Q. You couldn't face him, could you?

[Defense attorney]: Objection.

The Witness: For what?

[Prosecutor]: Did you face him?

The Witness: No, I didn't.

Q. Did you tell him, Charles, tell him, I didn't do nothing?

[Defense Attorney]: Objection.

The Court: Sustained.

[Prosecutor]: Q. Did you say anything to Charles Reed at that time?

The Witness: No, I did not.

* * *

Q. Did you see the two of them [Mrs. Owen and Ms Webb] identify you at the line-up?

A. I don't know if they identified me or not.

Q. Did you see them do anything at the line-up?

A. They didn't do anything.

Q. Did you say to them, tell them, Skipper, I didn't do anything.

[Defense Attorney]: Objection.

The Court: Sustained.

The Witness: No, I didn't tell them anything.

[Prosecutor]: Did you put your head down or say anything?

A. No."

The State then questioned defendant concerning his silence with the police at the station:

"[Prosecutor]: Q. When the police officers told you you were being charged with murder, you said on direct that you put your head down.

The Witness: A. Yes.

Q. Did you tell them that, I didn't shoot at nobody?

[Defense Attorney]: Objection.

The Court: Sustained.

[Prosecutor]: What basis?

The Court: Arguing with the witness.

[Prosecutor]: Q. Did you say anything to the policeman?

The Witness: A. No.

Q. Did you say, I was not in the Skipper's Lounge?

[Defense Attorney]: Objection. May we have a sidebar?"

Defense counsel objected to this line of questioning because it constituted comment on the silence of the defendant. The trial judge overruled the objection. The prosecutor then continued his questioning, and elicited from defendant his testimony that when he was told by the police he was charged with murder, he did not reply "What murder," "when did the murder happen," "who got killed," or "did it happen in Skipper's Lounge." Finally the prosecutor asked:

"Q. Did you say anything at all to the policeman when he said, you are charged with murder?

[Defense Attorney]: Objection

The Witness: No.

The Court: The answer may stand."

Later in the course of cross-examination the State was allowed to elicit from defendant his failure to deny that the murder weapon allegedly found in his possession was his when the police arrested him for unlawful use of weapons:

"Q. Now, at that time did you say to him, 'It is not my gun.'?

A. I didn't say anything to him.

Q. Did you say to him, 'It is not my gun,' yes or no?

A. No.

Q. Did you say to him —

[Defense Attorney] [Defense counsel]: Objection.

The Court: Overruled.

[Prosecutor]: Did you say to him, 'What gun are you talking about?.'

A. No.

Q. Did you say to him, 'I never saw that gun before?'

A. No.

Q. Did you say to him, 'I don't know whose gun that is.'?

A. No.

Q. Did you say to him, 'It's somebody else's gun.'?

A. No."

In their initial argument to the jury at the close of the evidence the State made no comments concerning this testimony. However, defense counsel in his closing argument sought to explain defendant's failure to say anything when Charles Reed came into the police station by suggesting that at that point defendant did not even know he was charged with murder. In rebuttal the State commented as follows:

"* * .* Now, you are charged with murder and that is the biggest charge you can have against you is murder. So you are charged with murder and you are sitting in the police station a couple of hours after the shooting.

'Hey, Jackie, you are charged with murder.' You put your head down. Do you say, 'What murder, who's murder, when was the murder, what are you talking about?' You have got to say something, what do you do? I put my head down. Well, if you were charged with murder and you committed a murder and they knew they had you cold turkey, what do you do?

[Defense Attorney]: Your Honor, I object to that comment.

The Court: Overruled.

[Prosecutor]: He sees Charles Reed inside the police station. I

didn't ask him 'Did you say anything to Charles Reed,' he brought it out.

'What did you do when you saw Charles Reed,' someone you had known for ten years? 'Put my head down.'

Well, if you were in a police station, I don't care what it is for even if it is a gun charge, and you see somebody you know, you look at them and say, 'Hi, Charlie, what's going on, Charlie, they got me on a bum gun beef.'

And what do you do, you look and you saw someone because you knew in your own mind you did something wrong, put your head down.

But not even at the scene where they charged him with the unlawful possession of this gun, which is a crime, you are charged with UUW, what did you say, nothing.

"Well, didn't you say, 'it is not my gun,' or 'Where did you get the gun, I never saw the gun, it is her gun, it is his gun or somebody else's gun.'

[Defense Attorney]: Objection.

The Court: Overruled.

[Prosecutor]: Nothing, he didn't say a word. Why not? Unless it is his gun and he had it."

■■■ We note first that defendant's failure to raise this issue in his motion for a new trial would ordinarily constitute a waiver of the matter on appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Defendant, however, did by timely objection bring the matter to the attention of the trial court. Because of this factor, and because the issue is one of potential error of a constitutional magnitude, we deem it appropriate to consider the matter under the plain error rule. *People v. Rehbein* (1977), 54 Ill. App. 3d 93, 369 N.E.2d 190, *appeal allowed* (1978), 67 Ill. 2d 594; *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43.

■■ The State characterizes their questioning and comment on defendant's silence as a legitimate response to a subject opened by defendant's testimony on direct examination. But prejudicial questions and commentary may not be excused or approved simply because a defendant has briefly touched on such matters under the questioning of his own attorney. (*People v. Jackymiak* (1943), 381 Ill. 528, 46 N.E.2d 50.) Defendant's failure to deny the charges against him or to protest his innocence prior to trial were immaterial and irrelevant and were not the proper subjects of questioning. (*People v. Lewerenz* (1962), 24 Ill. 2d 295, 181 N.E.2d 99.) As was stated in *People v. Sevastos* (1969), 117 Ill. App. 2d 104, 115, 252 N.E.2d 745, 750, quoting *United States v. Pennix* (4th Cir. 1963), 313 F.2d 524, 528:

"We do not question the well-settled rule that a defendant who voluntarily offers himself as a witness and testifies in his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. Cross-examination of an accused as to collateral matters should properly be limited to an effort to discredit him as a witness, and the limit is exceeded when the questions are not useful for that purpose and the necessary result, and perhaps the purpose, is merely to prejudice the jury against the defendant."

The State here may not rely on defendant's brief responses in this area on direct examination as justification for the extensive cross-examination it conducted on the same subject. Nor did defense counsel's attempt to place an innocent construction on this silence in final argument justify the final argument of the State set out above.

The State by its cross-examination and final argument called attention to defendant's post-arrest silence and sought to draw inculpatory inferences from this silence. This has been held to be a violation of due process, at least where the record indicates defendant was informed under *Miranda* of his right to remain silent. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118; *People v. White* (1977), 53 Ill. App. 3d 326, 368 N.E.2d 660.) The State seeks to distinguish *Doyle* from this cause because no evidence was presented here that defendant was informed of his *Miranda* rights. *Doyle* focused on the unfairness of warning a defendant that he had a right to remain silent and then using that silence against him at trial. But contrary to Justice Stevens' dissent in that opinion, asserting that giving the warnings caused the unfairness, it would seem that it would be equally unfair to use such silence against a defendant who independently was aware of this right and acted upon it without being warned of it by the police. (See *People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138.) Furthermore, it is clear that in Illinois such use of a defendant's post-arrest silence has long been considered to be error, without regard for whether he was warned of his right to silence. *People v. Rothe* (1934), 358 Ill. 52, 192 N.E. 777; *People v. Lewerenz* (1962), 24 Ill. 2d 295, 181 N.E.2d 99; *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 352 N.E.2d 295.

■■■ Having determined that the State's use of defendant's post-arrest silence in this cause was error, we must determine the effect of such error on defendant's conviction. Defendant contends that such error may never be harmless, and there is authority for that proposition. (*People v. Williams* (1977), 45 Ill. App. 3d 769, 360 N.E.2d 151; *People v. Green* (1977), 53 Ill. App. 3d 820, 368 N.E.2d 1129, *appeal allowed* (1978), 67 Ill. 2d 593.) However, those cases rely solely on the Federal case of

*United States v. Harp* (5th Cir. 1976), 536 F.2d 601, which found a *Doyle* violation to be reversible error. Subsequent fifth Circuit opinions have made clear that no *per se* rule was intended in *Harp*, rather each case was to be determined on its own facts. (*United States v. Davis* (5th Cir. 1977), 546 F.2d 583, *cert. denied* (1977), 431 U.S. 906, 52 L. Ed. 2d 391, 97 S. Ct. 1701; *Stone v. Estelle* (5th Cir. 1977), 556 F.2d 1242, *cert. denied* (1978), 434 U.S. 1019, 54 L. Ed. 2d 767, 98 S. Ct. 742.) We are, therefore, in accord with those Illinois opinions indicating that *Doyle* violations may be harmless error. (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898; see also *People v. Anderson* (1977), 46 Ill. App. 3d 607, 360 N.E.2d 1371; *People v. Mendez* (1977), 53 Ill. App. 3d 1038, 369 N.E.2d 212.) The standard to be applied in evaluating the effect of such a constitutional error is whether the reviewing court can say that the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) As we have noted, the evidence against the defendant in this case was overwhelming. Not only was the defendant identified by an eyewitness who knew him for over 12 years, but shortly after the shooting he was arrested with the murder weapon in his possession, according to the testimony of two police officers. Our evaluation of this evidence, together with an examination of the error, as viewed in the context of the entire record of proceedings, convinces us that this error was harmless beyond a reasonable doubt and does not require reversal of defendant's conviction.

## IV.

■■ At the time the defendant committed this crime he was on probation for burglary. The trial record affirmatively establishes that the trial judge considered the nature of defendant's crime as well as the possibility of rehabilitation. The sentence imposed, while in excess of the minimum, does not reflect an abuse of the trial court's discretion. Accordingly we find no merit in defendant's argument that his sentence should be reduced. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.