THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM A. FRANK, Defendant-Appellant.

Second District    No. 80-187

Opinion filed July 23, 1981.—Rehearing denied August 27, 1981.

Richard C. Kelly, of Bishop and Kelly, of Crystal Lake, for appellant.

Theodore J. Floro, State's Attorney, of Woodstock (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, William A. Frank, was convicted of murder and aggravated kidnapping and sentenced in the circuit court of McHenry County to concurrent terms in the penitentiary of 75 years for murder and 30 years for aggravated kidnapping.

In this appeal the defendant raises the following issues:

(1) Whether the trial court erred in denying defendant's motion to suppress certain physical evidence;

(2) Whether the trial court erred in not directing a finding in favor of the defendant at the close of all the evidence on the ground that the State failed to establish the proper venue of the

crime as being in McHenry County where he was tried and convicted;

(3) Whether the trial court erred in allowing the State to call without proper notice a co-defendant, thus depriving the defendant of due process of law;

(4) Whether the trial court erred in denying defendant's motion for mistrial because of improper cross-examination of the defendant in violation of a motion *in limine* granted prior to trial;

(5) Whether the trial court erred in not giving the jury an instruction on involuntary manslaughter and,

(6) Whether the defendant's sentence was excessive in view of the disparate sentences for his co-defendants.

The defendant, his two co-defendants, Edward Wieting and Clif Johnson, and the victim, Edward Caraher, all worked at International Minerals and Chemical Corporation in Libertyville, Illinois. In January of 1979, this plant was in the process of being dismantled because of the company moving to another location and there were relatively few employees working at the plant at that time. The defendant kept a gun at the plant and had another gun with a silencer attached which he kept with him at various times. There was some testimony to the effect that the victim and the defendant had quarreled not long before the day of the murder.

On January 22, 1979, the victim, the defendant and two co-defendants, Wieting and Johnson, were at the International Minerals plant. The defendant and the victim carried a desk out of the plant and put it in Johnson's van. As Caraher started to leave the van Wieting, armed with a pistol owned by the defendant, ordered Caraher to remain in the van saying they "wanted to talk to him." Caraher laughed and started to flee, whereupon Wieting shot at Caraher and wounded him in the knee. The defendant then wrestled Caraher to the ground and shot him in the other leg. Caraher still continued to struggle, whereupon Wieting struck him on the head with the pistol. There was also evidence of a knife wound in one leg and considerable bleeding therefrom. After subduing Caraher, they took him back to the van, handcuffed him and administered chloroform to him to keep him quiet. The three of them then drove around looking for some place to dump Caraher. At this time, Caraher was still alive, although unconscious. They went to a tavern and talked about what they would do with Caraher. Johnson then went outside and when he returned he said that he had killed Caraher by giving him chloroform. When they left the tavern, Wieting believed Caraher was still unconscious rather than dead as his leg was still bleeding. They returned to the plant where they took Caraher's car and drove it to Gurnee, where they removed the license and a tool box and threw away the keys. They then drove into

McHenry County where, on a deserted road, they dumped Caraher's body out into a snow bank. His body was found the next day by a McHenry County road crew.

McHenry County police immediately began an investigation of Caraher's death. They learned that Frank, Johnson and Wieting were friends and all worked at International Minerals, where Caraher had worked. They also learned that Frank and Caraher had quarreled at some previous time and that Frank, Wieting and Johnson had been seen together at a tavern the night before the body was found. However, Lieutenant Hendle of the McHenry County police testified he was not looking specifically for the defendant at that time but was looking for the victim's car. On January 30, Lieutenant Hendle and another McHenry County police officer observed Frank's car. They followed it to a gas station and after the car left the gas station, Lake County police, who had been alerted by Hendle, stopped the car and arrested Frank and Wieting. Previous to this, McHenry County police had been aware that Frank was driving on a suspended license and his car was not properly registered. There was also open liquor in the car which they were aware of as they had observed Frank and Wieting drinking liquor in the car. Frank and Wieting were taken to the McHenry County Jail, where Frank was charged with driving on a suspended license. He was not charged with murder at that time. He was given *Miranda* warnings and during the questioning he was asked if he had shot a gun at the plant. He replied that he had and agreed to show the officer the gun in question, which he said was at a tavern in North Chicago. The police procured a key to the tavern and went there. At this time the officer knew from other employees at the plant that Frank had a gun with a silencer attached which he carried in a green zippered case. The police had no information about a second gun. It was testified, however, that the defendant had agreed to give the police the gun he had shot at the plant. Arriving at the tavern in North Chicago, the defendant reached under the bar and began searching for something. According to Hendle he moved a green zippered case which was on a shelf below and appeared to shove it toward Hendle. Hendle then took the case, opened it and found the gun with the silencer inside the case. Frank also at that time procured a Lugar pistol from another location in the tavern and handed it to Hendle. While they were at the tavern, the police were informed by Frank that he had shot the gun in the basement of the tavern and they searched the basement and found some spent bullets and casings. The spent shells and casings taken from the basement were found to match a bullet in the leg of Caraher. However, the defendant had drilled out the barrel of the silencer so that no ballistic determination could be made as to the gun from which the bullet found in Caraher's leg had been fired.

While at the police station on January 30, the defendant made a statement to the police. He was not, however, charged with murder or held at that time. He was given a receipt for his guns and was released.

In the interval between January 30 and September 12, 1979, the police learned more about the details of Caraher's death from persons to whom the defendant and his co-defendants had talked. On September 12, 1979, the defendant was arrested and charged with Caraher's murder. Wieting and Johnson were also arrested and gave inculpatory statements. Prior to the defendant's trial, Wieting and Johnson negotiated guilty pleas and were sentenced to 30 and 35 years in the penitentiary respectively.

While in custody in September of 1979, the defendant also gave an inculpatory statement after he had been interviewed by the State's Attorney who had stated to him that if the defendant would "cooperate" and give a statement he, the State's Attorney, would not ask for the death penalty, otherwise he would seek the death penalty, reciting to the defendant some of the unpleasant effects of being electrocuted. Defense counsel made a motion to suppress defendant's confession on the ground that it was obtained by coercion and promises of leniency and after argument, this motion was granted by the trial court. The defense also made a motion *in limine* to preclude references to statements made by the defendant in his interview with the police following his arrest on January 30. This motion was also granted. At the trial, the prosecution, in cross-examination of the defendant, referred to defendant's interview with the police on January 30 and inquired if the defendant had ever at that time claimed that he shot the victim by accident. Objection to this was sustained and defense counsel in chambers made a motion for a mistrial. The trial court, after admonishing the prosecutor, denied the motion for a mistrial. The trial then proceeded and the defendant was convicted and sentenced.

Prior to the trial, the defendant made a motion to suppress the physical evidence—the two guns taken from Frank at the time of his first arrest in January of 1979. Defense counsel argued that the search and seizure of the pistol with the silencer was illegal because the defendant had only voluntarily given consent to the police to search for a Lugar pistol which they had learned about in the initial arrest—this was the gun the defendant referred to when he offered to take the police to the place where he kept the gun and show it to them. The police, however, had been informed by persons at the IMC plant who had seen it, that Frank had another gun with a silencer attached which he carried in a green zippered case. Upon arriving at the tavern where the Lugar was kept, Lieutenant Hendle noticed a green zippered case on a shelf below the bar which the defendant, whether intentionally or not, called Hendle's attention to by shoving it along the shelf. Hendle then took the case, unzipped

it and found the pistol with the silencer inside. The other gun was voluntarily handed over at the tavern. The trial court denied the motion to suppress the pistol with the silencer and both guns were admitted in evidence.

We do not regard the court's denial of the motion to suppress the pistol with the silencer as evidence as amounting to reversible error, as contended by the defendant. The defendant had voluntarily brought the police to the tavern, where he kept the two guns. The police had already been informed that the defendant kept a gun in a green zippered case, which he sometimes carried with him, and they were searching for guns at the time they were at the tavern, in accordance with the defendant's consent. We think it was not reasonable to expect the officers to disregard the green case, similar to the one previously described by one of defendant's co-workers, which was reported to contain a gun and which was not only in plain view on a shelf in the tavern but attention to which was called by the defendant himself pushing it along the shelf. Hendle would not reasonably have known at that time that the gun inside the case was not the Lugar referred to in defendant's offer to show the police the gun he had referred to at the time of his arrest as being the one he had shot at the plant. In any event, we think it was not beyond the reasonable limits of the consent for Lieutenant Hendle to have unzipped the case which he had reason to suppose contained a gun owned by the defendant and who at that time was a logical suspect.

We are aware of those cases holding that a consent to a search is limited to the area or objects specified in the consent and the search may not go beyond the extent of that consent. In *People v. Schmoll* (1943), 383 Ill. 280, cited by the defendant, the defendant in that case consented to the search and seizure of one medical file. However, the police searched generally and seized all the defendant's medical files. Our supreme court held that this search and seizure was beyond the scope of the consent. In *People v. Sanders* (1976), 44 Ill. App. 3d 510, 513, the consent to "look into" the defendant's automobile trunk was held to have been exceeded by a minute search of the trunk, which uncovered a paper bag which the defendant attempted to stop the officers from examining but which the officers refused to yield up and which was found to contain marijuana.

■■ However, in the case before us the consent was not so clearly limited as in *Schmoll* and *Sanders*, since no consent to a search was requested and the fact of the defendant offering to take the police to the tavern to see the weapon they had asked him about was a mere offer to co-operate with the police. It is possible to argue that Lieutenant Hendle exceeded the defendant's intention when he examined the zippered green case, but we think that was a reasonable consequence of the defendant's invitation to the police to be present and examine the gun at the tavern premises,

inasmuch as the case containing the gun was clearly visible and no restrictions were indicated by the defendant. The case here is more nearly akin to the circumstances in *People v. Bombacino* (1972), 51 Ill. 2d 17. There the lethal weapon—a baseball bat—was observed by the police officer through the open window of an automobile which the officer had been informed belonged to the defendant and which was standing in the driveway of one of the defendant's companions. One end of the bat appeared to have blood on it, and the police officer reached into the automobile and removed the bat. The supreme court upheld the trial court's denial of a motion to suppress the bat as evidence, saying that the taking of the bat under the circumstances did not constitute an unreasonable seizure. In the case before us the defendant volunteered to lead the police to a place where he kept the gun he had fired at the plant without disclosing that he had a second gun at the same place. The police officer being legally on the premises observed the case which had previously been mentioned as containing a gun. After the officer had opened the case which contained the silencer gun, the defendant said that that was not the gun he had shot at the plant, whereupon the defendant went to another place and returned with the gun (a Lugar) which was the gun he had discharged at the plant. We think these circumstances do not amount to an unreasonable seizure of the pistol with the silencer.

The defendant also raises a question as to the venue of the crime. He contends that it was not proved beyond a reasonable doubt that Caraher was killed in McHenry County, where his body was found and where the defendant was tried for murder. The only definite evidence as to the cause of the victim's death was given by Dr. Robert Stein, pathologist and chief medical examiner for Cook County. He expressed the opinion that the cause of death was exposure from being dumped into the snow bank and left there over a period of time during very low temperatures. This occurred in McHenry County. While Dr. Stein thought that the wounds inflicted to the victim by gun and knife were contributing factors, he believed the condition of the body when found was consistent with death from exposure. While Clif Johnson indicated that he believed he may have killed the victim by administering a large dose of chloroform to him in the parking lot of the Conqueror I in Lake County, there was no medical evidence establishing the cause of death as being an overdose of chloroform. Death from chloroform was a possibility but it was not established as a fact nor was the exact time of death known. The best available evidence was the opinion of Dr. Stein that Caraher died from exposure.

■■ Moreover, wherever it occurred, Caraher's death had a number of contributing factors, the wounds inflicted by gun and knife, the chloro-

form and the exposure. Section 1—6(f) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 1—6(f)) provides that:

> "If an offense is committed upon any railroad car, vehicle, * * * passing within this State, and it cannot readily be determined in which county the offense was committed, the offender may be tried in any county through which such railroad car, vehicle, * * * has passed."

Thus, if Caraher died in the van from a combination of injuries inflicted on him by the defendant and his companions, venue would properly be in McHenry County as being the county through which the van had passed. This point of appeal is therefore rejected.

■■ The defendant says he was deprived of due process of law by the State calling Edward Wieting as a witness without having indicated to the defense discovery motion that it intended to call Wieting. Defense counsel claims to have been taken by surprise. However, it is clear from the testimony that defense counsel relied on assurances from another lawyer—Wieting's defense counsel—that Wieting would not agree to testify and would not be called by the State. This assurance would not, of course, bind the State. It is obvious that the State did not originally intend to call Wieting as he was a co-defendant. However, Wieting pleaded guilty on January 16, a week before the defendant's trial, and was immediately taken away to the penitentiary. While there he agreed to testify. His name appeared on the list of possible State witnesses prepared for the jury and was read to the jury on the morning that jury selection for defendant's trial began. Defense counsel claimed surprise because he had relied on assurances from Wieting's lawyer that Wieting would not testify. He objected to Wieting as a witness due to the inadequate notice, and the court gave defense counsel an opportunity to interview Wieting before he testified, which counsel did. Defense counsel did not ask for a continuance based on surprise or for time needed to reorganize his defense, but announced he was ready for trial and the trial proceeded. We do not think these circumstances amounted to such a deprivation of due process by the State to merit a new trial.

■■ As a further basis for a new trial, the defendant raises the contention that the trial court erred in denying his motion for a mistrial when the prosecutor asked a question on cross-examination which violated the pretrial ruling granting a motion *in limine* to preclude reference to statements made by the defendant at the time of his arrest on January 30. The defendant had testified that his shooting of the victim was accidental and the prosecutor then asked if he had told the police it was an accident during his questioning on January 30. The question was immediately objected to and was not answered by the defendant. The trial court

sustained the objection and reprimanded the prosecutor; however, the trial court refused to grant defense counsel's motion for a mistrial, saying that it did not consider that the prejudice to the defendant had been so severe as to merit declaring a mistrial. Whether the defendant's motion for a mistrial was based on a plain violation of the order *in limine* not to refer to statements made by the defendant to the police on January 30, or on the principle that the defendant cannot be impeached by a showing of his post-arrest silence when he was interrogated by the police, is not entirely clear from the record. The defendant's brief refers to the principles set out by the United States Supreme Court in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, where the court held that the prosecutor's cross-examination of the defendant as to his failure to inform arresting police officers of circumstances indicating an attempt to frame him violated the defendant's right to remain silent after being given *Miranda* warnings. In *People v. Rush* (1978), 65 Ill. App. 3d 596, the court, following *Doyle*, also held such questioning about post-arrest silence to be improper but determined it was harmless error in that case in view of the overwhelming evidence otherwise against the defendant.

In the case before us, the impact of the improper questioning was much less severe than in *Doyle* and *Rush*—only one question was asked and it was not answered, objection was sustained and the trial court instructed the jury to disregard the question and that line of questioning was not pursued. The effect on the trial as a whole was therefore minimal and whether properly regarded as a violation of the right to remain silent after arrest as in *Doyle*, or whether the objection to the question was founded on a violation of the order *in limine* not to refer to statements made following the January 30 arrest, we think the error was harmless. In view of the other overwhelming evidence of the defendant's guilt, we do not feel one improper question had an impact grave enough to require a new trial.

■■ ■ It is the defendant's contention that the trial judge erred in not giving a requested instruction on involuntary manslaughter. It is, of course, the general rule that it is reversible error for the trial court to refuse to give a manslaughter instruction in a murder trial if there is evidence which would permit a finding by the jury of guilty of manslaughter, rather than murder. (See *People v. Canada* (1962), 26 Ill. 2d 491; *People v. Landry* (1977), 54 Ill. App. 3d 159.) In the case before us the trial court did give an instruction on voluntary manslaughter but refused to give an instruction on involuntary manslaughter. Its reason for refusing the latter instruction was explicit and, we think, correct. The trial court pointed out that the testimony as to the shooting of Caraher by the defendant indicated that Caraher was lying on the ground when he was shot and there was no evidence he possessed a gun or any means of

threatening the defendant when the shooting occurred. The other conduct of the defendant in concert with his two co-defendants, *vis-a-vis* Caraher, such as administering chloroform and abandoning him in a snow bank, was certainly not in the nature of inadvertence, mere recklessness, negligence or accident, but were deliberate acts. There was no evidence that anything done to Caraher by the defendant on the night of the murder was involuntary or unintentional. The gist of the crime of involuntary manslaughter is recklessness. (Ill. Rev. Stat. 1979, ch. 38, par. 9—3.) The conduct of the defendant in this case appears to have been callous and deliberate from beginning to end. The only possibility of recklessness entering into it was in the firing of the gun by the defendant and the evidence indicates that that was done deliberately while the victim was lying on the ground. We agree with the trial court's denial of the requested instruction on involuntary manslaughter since the evidence does not support such an instruction.

■■ Lastly, the defendant complains about the disparity of his sentence of 75 years as compared to that of his co-defendants, who pleaded guilty and received sentences of 30 and 35 years. We see no error in this disparity under the circumstances. The defendant supplied the guns which were the initial force used in subduing the victim as well as participating in the actual kidnapping and abandonment in the snow bank. Wieting, whose bargain with the State was negotiated before the defendant was tried, appears from the testimony to have had little or no previous record, which was not true of the defendant. Johnson, the other co-defendant had, or at least thought he had, a serious grievance against Caraher who, he believed, had some responsibility for the death of his son. The disparity is thus not unreasonable, and we see no evidence based on this difference in sentencing alone that the defendant was being punished for standing on his right to trial.

We granted leave to cite as additional authority in defendant's behalf the recent case of *People v. Gleckler* (1980), 82 Ill. 2d 145. We see no relevance to the case before us. In *Gleckler*, the defendant was convicted of murder along with his two companions. The other two were given prison sentences, but Gleckler was sentenced to death. On his appeal, Gleckler argued that he had acted under compulsion and so was not guilty of murder, therefore he could not be sentenced to death. While rejecting Gleckler's argument that he had acted under compulsion and therefore was not guilty of murder, the court vacated the death sentence and remanded the case for imposition of a sentence other than death. The court in *Gleckler* said: "Our revulsion toward this crime and our lack of sympathy for Gleckler cannot justify executing only him." (*Gleckler*, at 171.) This indicates that the court would not impose the death penalty on only one of three who were equally guilty of murder, but we do not read

it as having any effect on the question whether a person who is found guilty of murder after a full trial should have his sentence reduced to the length of sentence of his companions who pleaded guilty and were not tried. In the recent case of *People v. Walker* (1981), 84 Ill. 2d 512, 528, the distinction was made when Justice Ryan in his concurring opinion said:

> "These cases which I have discussed did not involve the death penalty, and for this reason are not helpful in deciding the case now before this court. The death penalty is such a different penalty that the logic and reasoning of the court in applying other penalties are of little help in justifying the imposition of the ultimate penalty."

The evidence indicated a better chance of rehabilitation by one of Frank's accomplices (Wieting) and the other defendant (Johnson) at least had, or thought he had, a serious grievance against the victim. The citing of the *Gleckler* case suggests the argument that because Gleckler's death sentence was reduced to imprisonment, Frank's prison sentence should be reduced to that of his accomplices. Due to the qualitative difference between a death sentence and a prison sentence, we do not accept the logic of that argument.

The judgment of the circuit court of McHenry County is affirmed.

Judgment affirmed.

HOPF and NASH, JJ., concur.