THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GORDON L. McKINNEY, Defendant-Appellant.

Fourth District   No. 4—88—0685

Opinion filed February 1, 1990.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

John Robinson, State's Attorney, of Sullivan (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Gordon L. McKinney (defendant) was convicted in the circuit court of Moultrie County of arson (Ill. Rev. Stat. 1987, ch. 38, par. 20—1(a)) and subsequently sentenced to a term of imprisonment of five years. Defendant appeals, contending: (1) the trial court erred in allowing the State to introduce statements that defendant made two months before the fire; (2) the State failed to prove defendant guilty beyond a reasonable doubt; (3) the State improperly elicited immaterial evidence of defendant's prearrest silence; and (4) defendant was denied effective assistance at counsel.

FACTS

Gordon L. McKinney (defendant) and Betty Coslow were living together in Coslow's apartment, which was located in James Austin's apartment building in Lovington, Illinois. On March 4, 1988, defendant and Coslow, with others, were frequenting bars in Decatur, Illinois, and in the course of the evening Coslow drove off with others, leaving the defendant without a vehicle. Defendant arranged a ride back to Lovington and in the presence of other residents messed up the Coslow apartment, even to the extent of throwing his own television set over a second-story bannister. Coslow had moved into the apartment three days before and items were still stored in boxes. Other building occupants were in and out while the trashing took place. They then left the Coslow apartment, leaving defendant behind, and, approximately 15 minutes later, the Coslow apartment was on fire. The whole building was basically destroyed by the fire.

Building tenants, who were aware of the damage done by the defendant in the Coslow apartment, confronted defendant outside the building during the fire. There was evidence that defendant said he was sorry and said, "Why don't you turn me in? Go ahead and turn me in."

Fire inspectors determined the fire started near the end of the couch in the Coslow apartment. There was evidence indicating that a misplaced cigarette or carelessly disposed of match would not have resulted in such an intense fire within the short time that the defendant was alone in the apartment. The fire investigators also testified that it was their opinion the fire was intentionally started.

No explanation of the cause of the fire was given by the defendant from the time of the fire until he testified during the criminal trial. At trial he testified he laid down on the couch, lit a cigarette and discarded the match. He also stated that by the time he realized

that there was a fire at the end of the couch the flames were seven feet high.

ANALYSIS

I

Prior to trial defendant was denied a motion *in limine* seeking to preclude the State from introducing evidence of a statement the defendant made on January 11, 1988, when defendant was interviewed by officers on an unrelated matter. During the cross-examination of defendant he was asked if he recalled telling Deputy Harold Morgan that if he told Morgan something he should not, he would lie about it in court. The defendant testified he did not recall. On rebuttal, Deputy Morgan and Police Chief Newberry testified as to a conversation with defendant, in a tavern, when defendant was intoxicated, and the defendant—after being denied an "off the record" conversation—stated: "That's okay. If I say anything I shouldn't, I'll lie about it in court anyway." The defendant argues this was error requiring reversal.

During the instruction conference and before final arguments, the trial judge *sua sponte* reversed his position on the admission of this evidence and, on returning before the jury, ordered the testimony stricken. The judge also polled the jury to determine if every jury member would be able to disregard the evidence. He received affirmative answers.

We recognize the only possible relevance of the testimony of this conversation in a bar related to the credibility of the defendant. Defendant's veracity was being attacked. Defendant cites *People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50, for support of his argument. Lampkin, a black, was convicted of murder of a white State police officer. Evidence was introduced that six years before the alleged murder he had threatened to "get" other white officers "later." The admission of this earlier threat brought reversal and a new trial. In *Lampkin*, however, the erroneous evidence was introduced, not to attack veracity, but as evidence of intent to commit the murder. We do not find *Lampkin* applicable to the present case.

■■ The general rule appears to limit challenges to veracity, or credibility, to an opinion as to the witness' reputation for truth and veracity in the community. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §608.3, at 346 (4th ed. 1984); E. Cleary, McCormick on Evidence §44, at 90 (2d ed. 1972).) There have been exceptions where, by cross-examination, the prosecution establishes defend-

ant had testified on direct about matters which had in fact involved false statements under oath. (*People v. Miller* (1958), 13 Ill. 2d 84, 108, 148 N.E.2d 455, 468.) The *Miller* opinion includes the following statement:

> "Where an accused takes the stand on his own behalf, he tenders his character and reputation as a direct issue, thus subjecting his credibility to the same tests as applied to any other witness, (See: *People v. Johnson*, 333 Ill. 469; *People v. Hicks*, 362 Ill. 238; *United States v. Skidmore*, 123 F.2d 604,) and the court has wide discretion in determining the propriety of cross-examination tending to reflect on his character. (*People v. Halpin*, 276 Ill. 363.)" (*Miller*, 13 Ill. 2d at 108, 148 N.E.2d at 468.)

In *Miller*, however, the cross-examination did not exceed the limits of the direct examination. In the present case, there was no testimony on direct by the defendant relating to the January 11, 1988, meeting.

However, we need not decide the propriety of the reference to January 11. The trial court struck the testimony and received assurances from the jury members that they would not consider the testimony. The general rule is that the striking of evidence erroneously admitted during a trial cures the error except in extreme cases, where it is manifest the prejudicial effect of the evidence remained with the jury despite its exclusion and influenced its verdict. (*McKenna v. Chicago City Ry. Co.* (1921), 296 Ill. 314, 326, 129 N.E. 814, 819; *People v. Endress* (1972), 5 Ill. App. 3d 821, 824-25, 284 N.E.2d 725, 728.) The question whether there should be a mistrial should go to the sound discretion of the trial court in the first instance, such court being best suited to judge the effect on the jury. In absence of a showing that the defendant has been prejudiced, the trial court's ruling should be upheld. (*People v. Dolgin* (1953), 415 Ill. 434, 446, 114 N.E.2d 389, 395.) We find that the trial court's decision, considering the evidence in the present case, should be upheld.

## II

As to the proof-beyond-a-reasonable-doubt issue, we recognize the long-established rule that guilt can be proved entirely by circumstantial evidence. (*People v. Franklin* (1985), 130 Ill. App. 3d 514, 519, 474 N.E.2d 776, 780; *People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605, 608.) The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d

237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) We need not elaborate further on the evidence except to emphasize defendant's state of mind and the expert's opinion that the fire intensity was too great, considering the time period, from ignition to discovery, to have been started with a carelessly discarded match or cigarette. We agree with the State that the present case is similar to the facts in *People v. Alexander* (1966), 77 Ill. App. 2d 151, 222 N.E.2d 172. The evidence was sufficient to sustain a finding of the defendant's guilt beyond a reasonable doubt.

### III

Defendant, during his testimony at trial, disclosed for the first time his defense of accidentally starting the fire by lighting a cigarette and carelessly disposing of the match. On direct examination, defendant did not mention talking to firemen or any law enforcement officer during the time the fire was fought or any time thereafter prior to the trial. On cross-examination, he was questioned as to why he did not report his conduct at the time of the fire. Defendant argues this cross-examination was erroneous because the subject was not covered on direct, the questions were not relevant, and the questions were in violation of due process.

■ As to the due process issue, we note that the United States Supreme Court has held that government's use of the accused's pre-arrest silence regarding the crime for which he was arrested and prosecuted, for the purpose of impeaching his credibility on cross-examination and after he has taken the stand in his own defense, did not violate the defendant's fifth amendment rights and did not deny him the fundamental fairness guaranteed by the fourteenth amendment. (*Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124; *People v. Graves* (1986), 142 Ill. App. 3d 885, 889, 492 N.E.2d 517, 521.) This is in contrast to post-arrest silence. See *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Rush* (1978), 65 Ill. App. 3d 596, 606, 382 N.E.2d 630, 637.

■ Defendant acknowledges the *Jenkins* decision and states that regardless of the *Jenkins* holding, the rules of evidence still apply and evidence which is irrelevant should not be admitted. The supreme court stated the rule applicable to impeachment by proof of failure to state a fact on a prior occasion in *People v. Henry* (1970), 47 Ill. 2d 312, 320-21, 265 N.E.2d 876, 882, as follows:

"It would appear that no prior inconsistent statement in the usual sense was involved, but inconsistency in the literal sense is not always required for impeachment. In *Carroll v. Krause,*

295 Ill. App. 552, the witness testified that an auto in which the plaintiff was riding had but one headlight. At an earlier inquest the witness omitted mention of the fact of the single headlight. It was held that the prior statement was admissible for impeachment purposes, though the witness had not been asked specifically about the auto's headlights at the inquest. The court said at page 562: 'The rule is that the omission of a witness to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact. 70 C.J. 1061; Greenleaf on Evidence (16th Ed.) Vol. I, sec. 462a.' Where, as here, it is claimed there has been a material omission of matters contained in a prior statement from later testimony it is logical that the fact of such omission should be admissible. Wigmore says: 'A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the nonexistence of the fact.' (Wigmore on Evidence, (3rd ed. 1940), sec. 1042); see also, McCormick on Evidence (1st ed. 1954), sec. 34; *Erickson v. Erickson and Co.*, 212 Minn. 119, 2 N.W.2d 824.) It would have been natural for the witness to have told in her testimony of the claimed coercion." (Emphasis in original.)

This statement was repeated in *People v. Owens* (1976), 65 Ill. 2d 83, 91-92, 357 N.E.2d 465, 470.

We must determine whether the circumstances rendered it incumbent upon the defendant to notify firemen, during the fire, that he did or may have accidentally or negligently caused the fire. No statement was given to officers or firemen by the defendant at the time of the fire. If, in fact, the fire was accidental, there could be doubt in the defendant's mind as to cause. To adopt a rule that it is likely that everyone who acts accidentally or negligently will immediately acknowledge that action or negligence fails to meet the test of reason. This is far different than being expected to immediately relate an act establishing self-defense or a defense witness stating an alibi for a defendant during the first questioning by authorities. The trial court erred in allowing this type of cross-examination. The silence does not meet the relevancy test as set forth in *Henry*.

However, our evaluation of the evidence, coupled with the examination of the error, as viewed in the context of the entire record of proceedings, convinces us that the error was harmless. *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350.

## IV

Defendant's final contention is that he was denied the effective assistance of counsel when counsel, under the guise of impeaching witness Mary Wren, questioned her about prior statements she gave to police, thereby eliciting incriminating hearsay testimony. In order to evaluate the claim, it is necessary to examine the testimony of the State's witnesses, Wren and Tim Doggett. They were the last two witnesses in the State's case in chief. Doggett was a young man, a friend of the defendant, who was spending the night with Mary Wren, in Wren's apartment located in the same building where Betty Coslow had her apartment. Wren and Coslow were sisters. Both Doggett and Wren described defendant's angry return to the apartment building. They described the damage caused by the defendant to the Coslow apartment and Doggett's wrestling with defendant. There was a description of their leaving the Coslow apartment, and of Doggett returning 15 to 30 minutes later and seeing defendant standing looking at six-foot-high flames. Doggett then alerted Wren and others of the fire danger. Doggett did not testify as to seeing defendant start the fire or defendant saying he started the fire.

Wren testified as to witnessing defendant "tearing up" the Coslow apartment. She testified she and Doggett returned to Wren's apartment, with Doggett returning to the Coslow apartment "probably about fifteen, twenty minutes after that," and coming running back to give the fire alert. She testified defendant came to her apartment, "probably within five minutes" and "he got down on his knees and said he was sorry about the fire." She testified, "I told him he was insane for even setting it, knowing that I had a baby in the house," and defendant "just kept saying he was sorry." She further said she "hit him in the face a few times."

After leaving the burning building, Wren related on direct examination she sat in a car with Doggett and Wren's young son, during the fire, and defendant came to the car. In answer to a question as to what defendant said, she answered:

> "He said somebody go snitch on me, one of you go snitch on me. I said, 'No, we are not a snitch.' I said, 'You are the big man that set that fire, you go tell on yourself.' And I hit him again. Then he shut the door and he left."

On cross, defense counsel appears to have centered his examination on an attempt to attack the credibility of Wren. He first established Wren had given a statement to Officer Newberry on March 8, 1988, which did not include mention of defendant coming to her apartment, getting on his knees and saying he was sorry. Defense

counsel then established the statement to Newberry included the following: "That there was a pile of things burning, Tim ran down to my apartment and grabbed my little boy."

Next, defense counsel referred to a statement given by Wren to Terry Brown, also given on March 8, 1988, which statement included the following quote:

"After a long time Tim went down to check on Gordon, when Tim looked into the hole previously made Tim saw Gordon bring his hand back up from lighting a pile of stuff on fire. Tim told Mary the fire was already burning on the other side of the pile, and so on and so forth, that Gordon was lighting the fire."

Defense counsel then referred to an April 6, 1988, statement by Wren, which included: "Tim saw Gordon standing over the fire and throwing more stuff on it, not that he lit the fire but that he threw more stuff on." Wren acknowledged making the various statements.

The record indicates that the defense counsel's reason for this entire line of questioning was to impeach Wren's credibility by showing what might appear to be inconsistency in her various statements. In determining if this trial tactic establishes incompetency of counsel, our court must consider whether the damaging effect of Wren's testimony on direct justified such drastic action. If the statements, which were obviously based upon what Doggett had said to Wren, thus being hearsay, failed to destroy Wren's credibility, they undoubtedly did damage to defendant's case.

However, defense counsel was in a difficult position, stuck between his own Scylla and Charybdis. Wren's testimony on direct as to defendant's actions and statements after the fire started was damning. Defendant's actions in Wren's apartment after the fire started and in the automobile during the fire definitely make admissible defendant's failure to deny intentionally starting the fire during those two confrontations. The elements required by the *Henry* decision as to silence being unlikely were met.

■■■ The United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, formulated a two-part test for evaluating whether a claim of ineffective assistance of counsel rises to the level of a constitutional deprivation. Defendant must first demonstrate that counsel's performance was deficient. (*People v. Owens* (1989), 129 Ill. 2d 303, 309, 544 N.E.2d 276, 278.) Defendant must also prove that his counsel's deficient performance substantially prejudiced his defense. (*Owens*, 129 Ill. 2d at 309, 544 N.E.2d at 278.) To meet this second test, a defendant must show a reasonable probability that "but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

■■■ With hindsight, it might appear that defense counsel should have waived cross-examination of Wren or attacked in a different way. Regardless of what we might have done as counsel, considering the effect of Wren's direct testimony, we would be remiss in finding the defendant's claim of ineffective assistance rises to a level of constitutional deprivation. We find that counsel's performance was not such as can be called deficient. Moreover, there was not a showing of reasonable probability that but for counsel's alleged errors the result would have been different.

Affirmed.

SPITZ and STEIGMANN, JJ., concur.