THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PETER JONES, Defendant-Appellant.

First District (2nd Division)   No. 85—3116

Opinion filed June 16, 1987.

Walter La Von Pride, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals his conviction by a jury of home invasion, voluntary manslaughter, and aggravated battery, contending: (1) the State failed to prove him guilty beyond a reasonable doubt and the jury verdict was against the manifest weight of the evidence; (2) the circuit court erred in denying his motion for a mistrial premised upon an alleged prosecutorial discovery violation and prosecutorial trial misconduct; (3) the circuit court erred in rejecting defendant's requested involuntary manslaughter instruction; (4) the circuit court erred in telling the jurors that they would be allowed to go home only when they had finished their job; and (5) the circuit court erred in failing to order a mistrial *sua sponte* after the jury twice informed it that it was "hopelessly" deadlocked. He also urges that the circuit court abused its discretion in sentencing defendant.

On Saturday, July 9, 1983, the victim, Ernest Jones, picked up his

9-year-old son "C" from his estranged wife; the boy lived with his mother but spent most weekends with his father, who was then living with his sister Jennifer. The victim and "C" went to defendant Peter Jones' (no relation) apartment and picked up defendant and the victim's sister, Jennifer, who was defendant's girlfriend. They went to Rainbow beach where they met Beverly, a cousin of the victim, and her boyfriend and had their picnic and barbecue. The picnic broke up about 8 p.m. and everyone went back to defendant's apartment.

Sometime thereafter, either at about 8:30 p.m. or between 10:30 and 11 p.m., the victim, "C," Beverly and Beverly's boyfriend left defendant's apartment. Beverly and her boyfriend gave the victim and "C" a ride to the victim and Jennifer's apartment. Almost immediately after their arrival, the victim and "C" walked to a nearby "White Castle," bought some hamburgers, and returned to the apartment. Either the victim or "C" then closed and locked the apartment doors and they went into Jennifer's bedroom to watch television while they ate their hamburgers. The victim soon fell asleep; "C" continued to watch television until he also fell asleep. The victim woke sometime later, told "C" to turn off the television, and they both went back to sleep on Jennifer's bed.

The next thing "C" remembered was being awakened by a man, whom he subsequently identified as defendant, hitting him in the face. He saw his father leaning on the edge of the bed, bleeding, with a pair of scissors stuck in his stomach. He had not seen the actual stabbing of his father. Defendant left the room and "C" hid in the closet. When defendant returned he pulled "C" out of the closet, "snatched" off his jeans and underpants, and threatened to rape him. Defendant once again left the room; "C" this time fled the apartment and found a police car driving by outside. It was approximately 12:40 a.m. on July 10, 1983.

Patrolman Neil Logue and his partner were in the police car which "C" approached. Officer Logue described "C" as hysterical and dressed only in a shirt and testified that "C" had said that "he had been raped or mentioned something about a rape." The two policemen, at "C's" direction, went into the apartment building and proceeded down a hallway to the door of the victim's apartment. The door molding was broken loose and damaged, indicating a forced entry to Officer Logue.

Officer Logue went into the apartment alone and found the victim lying on the floor of the bedroom in a pool of blood; a pair of scissors, subsequently identified as the murder weapon, was lying next to the body. The officers called for back-up and an ambulance, which took

the victim to a hospital where he died approximately one month later, on August 14, 1983. He had been stabbed once in the left front chest, piercing the heart, and twice in the abdomen and stomach. He died of complications which resulted from the stabbing: abdominal infection, liver shock and failure, kidney failure and pneumonia.

After the police discovery of the body, "C" was apparently calmed by a "Mr. Ivy." "C" subsequently told police that defendant had killed his father. Detectives then went to defendant's apartment, where they questioned him and the victim's sister, Jennifer. They eventually arrested defendant.

Defendant was charged with attempted murder, home invasion and aggravated battery. "C" subsequently identified defendant's photograph and recognized him in a lineup. When the victim died one month later, the attempted murder charge was dropped and a murder charge added.

At trial, the prosecution relied primarily upon "C's" testimony, his identification of defendant, and an alleged oral statement made by defendant to a detective and an assistant State's Attorney from the felony review unit.

According to the confession, defendant went to the victim's apartment to tell him to begin paying his share of the rent. Defendant was apparently upset because of the strain that the victim's inability or unwillingness to pay placed on the victim's co-tenant, Jennifer, defendant's girlfriend. Defendant pounded on the door, received no response, and then pushed it in. He began to argue with the victim, the argument became a fight, and, as they "tussled," the victim grabbed a pair of scissors which were subsequently stabbed into him three times. Defendant then left the apartment, although he admitted that he had struck "C" during the struggle. At trial he denied having made the statement.

Defendant testified at trial that he had been at home with the victim's sister at the time of the killing and had, in fact, talked to another sister of the victim by telephone at the approximate time of the killing. Neither of the alibi witnesses, the victim's sisters, testified at trial, nor did "Mr. Ivy."

The only alibi witness who did testify for defendant was Felix James, the night watchman at defendant's apartment building. He testified that defendant had neither entered nor exited the apartment building between midnight and 7 a.m. on July 10, 1983. His testimony, however, was negated by the fact that defendant, by his own testimony, admitted that he had left the building sometime after 4 a.m. that day when he was arrested by the detectives.

Defendant appeals his convictions by a jury of voluntary manslaughter, home invasion and aggravated battery of a child and sentences of concurrent terms of 15, 20 and 7 years, respectively.

## I

■ Defendant initially contends that he was not found guilty beyond a reasonable doubt and that the jury verdict was against the manifest weight of the evidence. The most incriminating evidence against him was "C's" eyewitness testimony and the recounting of his alleged confession by the detective and the former assistant State's Attorney. This evidence placed him at the scene, struggling with the victim, and circumstantially led to the conclusion that he had stabbed the victim. The only contrary evidence was defendant's denial of having been at the scene and the night watchman's testimony. There was no physical evidence placing him at the victim's apartment on the night of the homicide.

The jury, however, was entitled to disbelieve defendant's denial, to discount the watchman's discredited testimony, and to accept the contrary incriminating testimony. Defendant has asserted that it was too dark in the bedroom for "C" to have satisfactorily and reliably identified his assailant. This assertion, however, is not supported by the trial testimony. At trial, it was disclosed that although the bedroom light was off, the lights of an adjoining bathroom and hallway were on and illuminating the bedroom, as was the dial light of a clock radio. Additionally, there was evidence of an unusual number of mirrors in the bedroom and of mirrors on the ceiling which would have reflectively increased the effect of the ambient light in the bedroom. "C" had two opportunities to see his assailant: first, when he was awakened by the beating and second when his assailant pulled him from hiding in the closet. Finally, it should be noted that "C" had spent a substantial part of the day in defendant's company. "C's" identification was sufficiently trustworthy to support defendant's conviction, especially in conjunction with the evidence of his purported confession. *People v. Danis* (1984), 129 Ill. App. 3d 664, 667-69, 472 N.E.2d 1194; *People v. Carlton* (1979), 78 Ill. App. 3d 1098, 1106, 398 N.E.2d 107.

■ ■ Defendant also asserts that he was not found guilty beyond a reasonable doubt of home invasion since the State failed to prove that he was not a peace officer acting in the line of duty, an element of the offense. This issue was not raised in the circuit court. Defendant moved for a directed verdict at the close of the State's case but did not specifically assert this issue. Additionally, although defend-

ant's post-trial motion is referred to in the transcript, the motion itself is not included in the record and there are no indications of what issues were raised by that motion.

·Assuming, *arguendo*, that the issue had been preserved, the first element of the offense of home invasion is that the individual committing the crime must be "[a] person who is not a peace officer acting in the line of duty." (Ill. Rev. Stat. 1983, ch. 38, par. 12—11.) Defendant contends that the State failed to prove that he was not a peace officer. This portion of the home invasion statute has been treated as a single integrated element (see *People v. Morrison* (1985), 137 Ill. App. 3d 171, 179, 484 N.E.2d 329; *People v. Davis* (1984), 124 Ill. App. 3d 813, 821-22, 464 N.E.2d 1150; *People v. Davis* (1982), 106 Ill. App. 3d 260, 265-66, 435 N.E.2d 838), which may be satisfied by proving that defendant's acts lie clearly outside the line of duty of a peace officer, without requiring the State to prove that defendant was not a peace officer (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 179; *People v. Davis* (1984), 124 Ill. App. 3d 813, 821). The evidence of this element must often necessarily be proved indirectly and circumstantially in light of the State's inability to call defendant to testify. *People v. Davis* (1982), 106 Ill. App. 3d 260, 265.

■ Defendant's confession asserted that he went to the victim's apartment to settle a rent dispute between the victim and defendant's girlfriend. Upon arrival, he forced entry into the apartment and began arguing and then fighting with the victim over the rent. The State maintains that this proves that defendant was not "a peace officer acting in the line of duty" and that he entered without authority. The State correctly asserts that these actions could not have fallen within a peace officer's line of duty. *People v. Morrison* (1985), 137 Ill. App. 3d 171, 179; *People v. Davis* (1984), 124 Ill. App. 3d 813, 821-22; *People v. Davis* (1982), 106 Ill. App. 3d 260, 266.

## II

Defendant's second contention is that the circuit court erred in denying his motion for mistrial after the State asked defendant a question concerning a blue felony review file which had not been disclosed to the defense. The State contends that the nonwork product contents of the file were disclosed to the defense. The circuit court limited the State's questioning concerning the file to the question of whether defendant had ever seen the file. Defendant said that he had not, and the State was permitted no further questions. Defendant admitted that he had seen a statement written on a note pad which he had refused to sign; however, he denied ever having seen the file in

112

question.

The offending file has not been included in the record and its contents were not disclosed. Defendant contends that the mere exhibition of the file so prejudiced the jury that a mistrial was required. He offers no factual or legal support for his contention and it is not persuasive. The State's actions, although arguably rising to the level of prosecutorial misconduct, resulted in no prejudice to defendant and do not warrant a grant of mistrial by the circuit court or reversal by this court. See *People v. Jackson* (1987), 154 Ill. App. 3d 241, 246.

III

■ Defendant next insists that the circuit court erred in refusing to give his involuntary manslaughter instruction. There is no indication in the record that such an instruction was ever tendered.

At the close of the State's case, the court directed the attorneys to prepare their jury instructions. Defense counsel then indicated that he was considering tendering both voluntary and involuntary manslaughter instructions. Subsequently, after the defense case, but before closing arguments, the court held an instruction conference with the attorneys. Apparently there had been a preliminary conference, but neither a transcript of it nor any refused instruction is included in the record on appeal. During the final conference, defendant tendered a voluntary manslaughter and a voluntary manslaughter elements instruction. The court accepted both over the State's objections. When the court asked defense counsel whether he had any further instructions, counsel indicated that he did not. Accordingly, any involuntary manslaughter instruction issue presented by defendant was waived by failure to offer such an instruction. *People v. Almo* (1985), 108 Ill. 2d 54, 66, 483 N.E.2d 203; *People v. Glass* (1984), 128 Ill. App. 3d 869, 873, 471 N.E.2d 597.

Defendant would have been entitled to such an instruction had there been some credible evidence in the record which, if believed, would have reduced the crime to involuntary manslaughter. (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696; *People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984.) Such an instruction must be given if warranted by the evidence; however, the nature of the killing, as represented through either multiple wounds or the defenselessness of the victim, may deny application of an involuntary manslaughter theory. (*People v. Ward* (1984), 101 Ill. 2d 443, 451-52; *People v. Frank* (1981), 98 Ill. App. 3d 388, 396-97, 424 N.E.2d 799, cert. denied (1982), 456 U.S. 927, 72 L. Ed. 2d 442, 102 S. Ct. 1973.) Similarly, the nature of the alleged criminal conduct may be of such

character as would defeat any assertion of reckless or inadvertent conduct. *People v. Burnette* (1981), 97 Ill. App. 3d 1015, 1019-20, 423 N.E.2d 1193.

■ The alleged confession here described a fight during which the victim was stabbed three times with a pair of scissors. Therefore, this was not an instance of death brought on by defendant's reckless conduct; it was a death caused by a fight which had resulted from defendant's having broken into the victim's apartment. The victim did not die through defendant's recklessness; rather, he died from complications resulting from three stab wounds inflicted upon him during his fight with defendant. An involuntary manslaughter instruction therefore was unwarranted. *People v. Simpson* (1978), 74 Ill. 2d 497, 504, 384 N.E.2d 373.

### IV

■ Defendant next contends that the circuit court erred in telling the jurors that they would be allowed to go home only after they had finished their job. The court's statement had followed a written three-part question from a juror:

"(1) How long do we have to stay here tonite?

(2) Where are we staying tonite?

(3) When will we be released from jury duty?"

It is obvious from these questions that this juror was curious about how long the jury would have to continue to deliberate that evening, where they were going to spend the night, and what, if anything, would come next. The court did not tell the jury that it would have to deliberate until it reached a verdict no matter how long it took. This juror's own questions indicated that the jurors were aware that they would have to deliberate the next day. Accordingly, when read in context with the juror's question, there was no error in the court's response.

### V

■ Defendant next asserts that the circuit court should have declared a mistrial after the jury disclosed through two notes that it was "hopelessly" deadlocked. Defendant failed to make any such motion at the time but now contends that the court should have done so *sua sponte.*

Initially, the jury never stated that it was "hopelessly" deadlocked. One note disclosed:

"Do we have to come to a unanimous decisions [*sic*] for or vs the defendant?

Is there a hung jury?

What happens if we cannot reach a decision—we are currently hung at 8-4?"

The second note disclosed:

"9 - guilty

3 - deadlocked"

The two notes disclose different verdict votes: neither indicates a "hopeless" or irreconcilable deadlock. Both notes were written during deliberations that immediately followed closing arguments on the last day of trial—the first day of jury deliberations. The verdict was returned the next morning after the jurors had resumed their deliberations. Nothing in the record indicates the length of those deliberations. Similarly, the court's actions did not indirectly pressure the "hold out" jurors. (*People v. Santiago* (1982), 108 Ill. App. 3d 787, 804-07.) There can be no requirement that a mistrial be declared merely due to the jurors' inability to immediately come to a unanimous verdict; disclosures of jury votes of 8-4 and 9-3 do not, on their face, disclose a jury deadlock. We find no error here.

## VI

■ Defendant's final contention is that the circuit court abused its discretion in sentencing him to 20 years for home invasion. Defendant argues that minimum sentences were intended for convicted individuals with minimal criminal records.

The circuit court considered defendant's record; however, it also considered the nature of the offense and the resultant homicide. Home invasion is a nonprobationable, Class X felony, subject to a term of imprisonment of from 6 to 30 years. (Ill. Rev. Stat. 1983, ch. 38, pars. 12—11(b), 1005—5—3(c)(2), 1005—8—1(a)(3).) The circuit court balanced the nature of the offense against defendant's history and imposed an intermediate sentence of 20 years. We cannot ascribe to such a sentence an abuse of discretion.

Accordingly, based upon the evidence and circumstances of the trial, there appear no bases upon which to interfere with the jury verdict or sentencing and defendant's convictions and sentences must be affirmed.

Affirmed.

SCARIANO, P.J., and STAMOS, J., concur.