THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN TROTTER, Defendant-Appellant.

First District (3rd Division)   No. 87—0756

Opinion filed December 28, 1988.

Paul P. Biebel, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Elizabeth Sklarsky, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

A jury convicted defendant John Trotter of murder and armed robbery. The trial court sentenced him to an extended term of 70 years for murder and 10 years for armed robbery, the sentences to be served concurrently. On appeal, defendant complains of a medical examiner's testimony regarding findings in a toxicologist's report; failure to give involuntary manslaughter and theft jury instructions; and prosecutorial remarks in closing arguments.

On April 6, 1986, near midnight, 83-year-old Florence Fuller was murdered in her apartment. A neighbor, Michael Pierce, testified that the 46-year-old defendant, who helped take care of the victim, had been staying with the victim several times a week. On that night, Pierce heard an exchange of voices. The victim said, "What's the matter with you, man? You crazy? What's wrong with you, man?" There were several minutes of silence, and then a gunshot.

Pierce heard footsteps coming from the victim's apartment and saw defendant leave the building carrying a bag. Pierce, who did not have a telephone, followed defendant and then telephoned the police from a public telephone. He returned home. Several minutes later he entered the victim's apartment with the police. Inside the apartment they smelled gas and found one of the stove burners operating. The

victim was lying on the couch. Blood ran down her neck from a gunshot wound behind her left ear.

Officer Nicholas DiMaggio and his partner observed that the victim was naked, covered partially by a blanket. He saw no marks on her hands. Her arms were across her chest. There was blood on the floor and a bag of change totalling $64.29.

Officer John Haugh and his partner obtained defendant's description and located him one hour later about three blocks from the murder scene. Haugh stopped defendant and his companion and asked defendant his name. Defendant replied, "I'm the man you're looking for." A search of defendant revealed the murder weapon and ammunition. He also had a bag with two red change purses containing jewelry, a key, buttons, a pen, a drapery hook, and $34.50. Defendant also carried unopened beer and whiskey. Haugh smelled alcohol on defendant, but did not believe defendant was intoxicated. Upon receiving his *Miranda* warnings, defendant stated, "Whatever she said I did, yes, I did. Whatever the old lady said I did."

Bernice Henry, the victim's 65-year-old sister, testified that she saw the victim at her home one week earlier. The victim had just been released from the hospital, where she was treated for malnutrition. She was not prone to falling down and was not senile.

Dr. Yuksel Konakci, a pathologist, conducted a post-mortem examination of the victim and concluded she died as the result of the gunshot wound. There was no evidence of close-range firing. The path of the bullet was almost parallel to the ground, traveling from the entrance wound behind the left ear to the opposite side of the head. The victim had external bruises and abrasions on the right side of her neck. Her neck was fractured in two places. The neck injuries were consistent with blunt trauma causing pressure on the neck and fracturing the bones. There were bruises and abrasions in the neck and upper chest area. The injuries were less than 24 hours old. The victim's two main arteries were 70% to 80% blocked, and she suffered from marked emphysema and hyperemia. The toxicologist's report indicated her blood-alcohol level was negative.

Richard Chenow, a firearms technician for the police, examined the murder weapon and found it could fire when 5 to 10 pounds of pressure were put on the trigger. The hammer block was in poor mechanical condition but was functional and safe. The technician opined that the gun would not accidentally fire as a result of a blow to the hammer or of being dropped, if it were not cocked. If the gun were cocked, it would not fire when someone grabbed it, unless the person holding the gun had his finger on the trigger and pulled it. Thus, the

gun would fire only if a person held the gun in an uncocked position with his finger on the trigger and a second person pushed the hammer back to the cocked position and pulled on the gun so as to cause the pressure on the trigger to reach five pounds. The person who grabbed the gun would then have a dark residue and possibly a burn on her hand.

Following his arrest, defendant made a statement. Defendant said he took the victim's gun, her money and her jewelry, and some ammunition. As he was leaving, the victim asked where he was going with her money. As he began to explain, the victim grabbed the gun, which he held in his right hand, and the gun went off accidentally. Defendant visited a friend, and they went to buy alcohol and change defendant's coins into currency. As they walked back, the police stopped them.

Defendant testified at trial that he had been taking care of the victim for five months. He drove her to the store and to the bank, and cooked and cleaned for her. On the day of the shooting, he drank alcohol intermittently throughout the day. Later, he saw the victim sleeping on the couch. He took a bag of change to buy more liquor and placed it on the table next to the couch. He then took the gun and bullets for his personal safety because it was after midnight. As he was reaching for the bag of change, he heard the victim mumble something. His right hand held the gun, with his index finger on the trigger. As he turned, the victim grabbed the gun and it fired. The gun was not cocked. Defendant shook the victim and asked if she was all right. She did not respond. Defendant panicked and left the house. He went to a friend's house and said he wanted to return to check on the victim's condition. First, however, he asked the friend to smoke some marijuana with him, because he thought he would go to jail for 5 to 10 years. The two men stopped to buy liquor and exchange the coins for paper currency. Defendant denied strangling the victim and maintained that the shooting was an accident.

In rebuttal, Officer Yucaitis testified the table was six feet from the couch where the victim was found.

Chenow testified in rebuttal that the gun would not fire without pressure applied to the trigger. It would not fire from simply pulling on the gun.

Defendant first contends that the trial court erred in permitting Dr. Konakci to testify that the toxicologist's report, which Dr. Konakci did not testify he relied upon, indicated that the victim's blood-alcohol level was negative. Defendant maintains that his general credibility suffered because the results in the toxicological report

contradicted his claim that the victim had been drinking.

■ In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 836, 102 S. Ct. 140, the court adopted Federal Rules of Evidence 703 and 705. Under these rules, a medical expert may testify to an expert medical opinion based on facts not in evidence where the data upon which the opinion is based is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. See also *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, *cert. denied* (1986), 479 U.S. 1012, 93 L. Ed. 2d 713, 107 S. Ct. 658; *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.

■ Dr. Konakci, a pathologist, conducted a post-mortem examination of the victim's body. A routine part of the examination included the withdrawal of blood for testing of blood-alcohol level. The testifying witness himself withdrew the blood and directed that the test be performed as part of the examination which would permit him to form an opinion as to the cause of the victim's death. Moreover, the reliability of the toxicologist's report is reflected by the nature of medical records, which are considered inherently reliable and commonly used as reference materials by medical experts. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322; *People v. Murphy* (1987), 157 Ill. App. 3d 115, 509 N.E.2d 1323.) We hold that the trial court properly permitted testimony regarding the victim's blood-alcohol level.

Defendant's reliance on *People v. Murphy* is misplaced. In *Murphy*, a psychiatrist testified about comments made by defendant's mother to a non-testifying psychiatric institute employee about defendant's conduct before the murder. The source, then, could be considered unreliable. In addition, the expert in that case expressly stated he did not use the information from the mother in making his diagnosis.

Defendant raises the issue of whether the toxicology report would be admissible pursuant to the statute which permits the admission of medical examiner's reports as *prima facie* evidence of findings. (Ill. Rev. Stat. 1985, ch. 38, par. 115—5.1.) The trial court sustained defendant's objection to the report's admission as evidence, and therefore, this issue is not before us.

Defendant next contends that the trial court erred when it refused to give the jury an involuntary manslaughter instruction.

■ ■ Involuntary manslaughter occurs where defendant kills another person without lawful justification and his acts which cause the

death are such as are likely to cause death or great bodily harm to some individual and those acts are performed recklessly. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.) A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross departure from the care which a reasonable person would exercise in the situation. (Ill. Rev. Stat. 1985, ch. 38, par. 4—6.) In contrast, a conviction for murder requires proof of an intent to kill or do great bodily harm, or knowledge that one's actions will create a strong probability of such a result. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).) A conviction for involuntary manslaughter, however, requires only reckless conduct. *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.

■ Defendant is entitled to an involuntary manslaughter instruction if there is slight evidence upon which a given theory could be based. (*People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448.) The instruction should not be given, however, if there is no evidence which would reduce the murder charge to manslaughter. *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.

An involuntary manslaughter instruction is not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, reveals the inapplicability of the theory. (*People v. Jones* (1987), 157 Ill. App. 3d 106, 510 N.E.2d 116.) The instruction is unnecessary when the nature of defendant's conduct is of such a character so as to defeat any assertion of reckless or inadvertent conduct. *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171; *People v. Mitchell* (1987), 163 Ill. App. 3d 58, 516 N.E.2d 500.

■ In the present case, the victim suffered a gunshot wound to the head, multiple abrasions on her neck, and a broken neck. The neck injuries occurred within 24 hours of the autopsy. These multiple wounds demonstrate that the nature of the killing could not have been the result of recklessness.

In addition, the victim was 83 years old, had recently been released from the hospital where she was treated for malnutrition, and she suffered from arteriosclerosis with two main arteries blocked up to 70% or 80%, marked emphysema and hyperemia. She was found lying naked on the couch. There were no marks on her hands to indicate she fought against defendant, *e.g.*, by grabbing for the gun. Her utter defenselessness against defendant's attack also demonstrates that the nature of the killing could not have been the result of recklessness.

Moreover, defendant's conduct indicates the shooting was intentional, and not mere recklessness. Defendant left the victim's home with her gun, ammunition and money. He went to a friend's house, and then to the liquor store. At the store, he exchanged the victim's change for currency and bought beer and cigarettes. He failed to notify the police of the shooting. This conduct belies any claim of recklessness.

As some evidence supporting a reduction to manslaughter, defendant points to Pierce's testimony that he heard the victim ask "What are you doing man?" We fail to see how this tends to show recklessness. In fact, it contradicts defendant's version of the events.

Defendant argues that he was reckless in approaching the victim in the dark with a gun in his hand, permitting her to grab the gun. Defendant fails to state that he pointed the gun at the victim. Instead, defendant states the gun was not cocked. Expert testimony, however, revealed that the gun was functionally safe and that a 10-pound pull on the trigger was necessary in this uncocked position. It would not fire without this pressure. It would not fire as a result of merely pulling on the gun. This evidence indicates the gun was not handled in merely a reckless manner.

Defendant's reliance on *People v. Bembroy* is misplaced. In that case, the victim suffered no other injuries and was not found to be in a completely defenseless posture. Moreover, defendant in that case actually pointed the gun at the victim. See also *People v. Fernetti* (1983), 117 Ill. App. 3d 44, 452 N.E.2d 790, *rev'd on other grounds* (1984), 104 Ill. 2d 19, 470 N.E.2d 501 (pointing gun at decedent evidenced recklessness); *People v. Farmer* (1977), 50 Ill. App. 3d 111, 365 N.E.2d 177 (pointing loaded gun at someone evidenced recklessness); *People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527 (aiming gun at victim was reckless).

We conclude that an involuntary manslaughter instruction was not warranted here. See *People v. Dewey* (1969), 42 Ill. 2d 148, 246 N.E.2d 232.

■ Defendant next contends that the trial court erred in declining to instruct the jury on theft. Defendant was charged with armed robbery, not theft. The two crimes are distinct. (*People v. McCarty* (1983), 94 Ill. 2d 28, 445 N.E.2d 298.) Theft requires only an intended, unauthorized deprivation of property, while robbery requires the use of force, regardless of intent. (*People v. McCarty* (1983), 94 Ill. 2d 28, 445 N.E.2d 298.) Since theft is not a lessor included offense of armed robbery, a defendant charged with armed robbery is not entitled to a theft instruction. (*People v. Gibson* (1985), 137 Ill.

App. 3d 330, 484 N.E.2d 858, *vacated on other grounds* (1986), 476 U.S. 1167, 90 L. Ed. 2d 974, 106 S. Ct. 2886.) No error occurred.

■ Defendant finally contends that the prosecutor made comments in the rebuttal closing argument which prejudiced defendant and denied him a fair trial. Initially, defense counsel argued to the jury that the police did a poor job investigating the case. The prosecutor stated in rebuttal, "Maybe in the future we will do better. Maybe in the future we will catch this guy a little sooner, but no harm was done. He did not go out and kill more people." The court sustained an objection in that the comment presupposed that defendant would kill other people. The prosecutor continued, "Just hopefully you caught just the opposite. He said he did not go out and did not kill other people. That's not the type of criminal he is." The court then overruled an objection.

Defendant argues that the comments imply he was "likely to commit other crimes." The statements did not predict that defendant would go out and kill again in the future. Moreover, any error was harmless. Reversal would not be warranted unless the argument as a whole was so seriously prejudicial that it deprived defendant of a fair trial. (*People v. Cunningham* (1984), 130 Ill. App. 3d 254, 473 N.E.2d 506.) In the context of the whole trial, we find defendant suffered no substantial prejudice. In light of the overwhelming evidence against defendant, the brief remark could not have altered the verdict. See *People v. Valentin* (1985), 135 Ill. App. 3d 22, 480 N.E.2d 1351.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

WHITE, P.J., and FREEMAN, J., concur.