THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRIAN HOARD, Defendant-Appellant.
First District (6th Division)   No. 1—91—2423

Opinion filed June 25, 1993.

Rita A. Fry, Public Defender, of Chicago (Julie M. Campbell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Joelle Marasco, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Brian Hoard, was convicted of the first degree murder of Jermaine Rhodes (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and was sentenced to a term of 40 years. On appeal, defendant contends that: (1) the trial court erred by refusing to give the jury involuntary manslaughter or reckless conduct instructions; (2) the trial court committed reversible error by refusing to give the jury an accomplice instruction despite the fact that the State's key witness was an unindicted co-conspirator; and (3) he was deprived of a fair trial due to several improper remarks made by the State.

The relevant facts are as follows. Captain Larry Heard, a security officer for the Chicago Housing Authority, testified for the State that at approximately midnight of May 16, 1989, he was patrolling a public housing complex when he noticed a crowd gathered. He and his partner drove once around the block, and when they returned, the group began to disperse. Heard noticed the deceased lying facedown on the ground. He had been shot several times. Heard immediately notified Chicago police, who arrived at the scene within minutes.

Officer William Wright of the Chicago police department arrived at approximately 12:30 a.m. Upon searching the scene, he and other officers found seven 9 millimeter cartridge cases lying five to seven feet from the deceased's feet. In addition, they found three live .22-caliber bullets, two located immediately at the deceased's feet. No fired bullets were found underneath the deceased's body. The deceased had suffered several wounds, including one to the left chest cavity and several on the left side of the neck and shoulder area. On May 28, 1989, Wright obtained warrants for the arrest of defendant and his brother, Sidney Hoard, for the deceased's murder.

On cross-examination, defense counsel asked Wright to examine the manufacturer's stamp on each of the 9 millimeter cases that were recovered. Six of the seven were from the same manufacturer; the remaining case came from a different manufacturer. Wright confirmed that a 9 millimeter cartridge is expended from a semiautomatic or automatic pistol as opposed to a revolver, and that a .22-caliber cartridge could be fired from a semiautomatic, automatic, or revolver pistol. He also confirmed that when a revolver is fired, the casing remains in the cylinder, whereas in an automatic or semiautomatic gun the casing is expended from the gun.

On the night of the shooting, Wright learned that another individual had been shot besides the deceased. That individual was identified as Tavares Williams, and he had been shot in his left upper thigh. Wright and his partner went to the hospital to question him. They had a conversation with Williams at the hospital, the substance of which Wright could not recall. After leaving the hospital, Wright went to the home of Bennie Jordan, but did not find him home. Wright and his partner confirmed that a gunshot residue test was administered on Williams to determine whether he had recently fired a weapon.

On redirect examination, Wright stated that Jordan was arrested and charged in connection with the deceased's murder on May 18, 1989, several days before the warrant for defendant's arrest was issued.

Dr. Tae An, a Cook County medical examiner, performed the autopsy on the deceased. The autopsy revealed the presence of 11 bullet wounds consisting of eight entry and three exit wounds, which were determined to be the cause of death. Ten wounds were located from the chest area upward; the eleventh wound was to the right thigh. Dr. An opined that one of the bullets entered the body, exited, and then reentered the body. With regard to the thigh wound, he stated that the bullet entered in an upward direction and deposited in the muscle near the right hip. Dr. An recovered five bullets and one small jacket fragment from the deceased's body. The results of the toxicology report performed on the deceased revealed the presence of .31 microgram of a cocaine metabolite.

On cross-examination, Dr. An stated that he detected no evidence of tatooing or stippling which would have indicated that the bullets were fired at close range. Four of the bullets recovered were large and copper-jacketed. Further, the thigh wound appeared different from all of the other entry wounds. A long marginal abrasion was present, indicating that the bullet did not enter from a right angle but instead traveled in an upward direction. The bullet which caused this

wound was lead, not copper-jacketed. It was also markedly flattened, possibly caused by the bullet striking the ground before it entered the body.

The State next called Tyrone Atkins, who testified that he had no recollection of any events that occurred the night of the deceased's murder. He stated he was not present when the deceased was shot. In addition, he denied knowing defendant, defendant's brother, Sidney, or Jordan. He did not recall speaking to police or an assistant State's Attorney about the murder. Over defense objection, the trial court granted the State's request to treat Atkins as a hostile witness and to question him about a written statement he gave police in May 1989 regarding the murder. Atkins acknowledged that his signature was on the statement, but stated that he was forced to make the statement after being hit several times by a police officer. Atkins stated that he never read the statement prior to signing it because he did not know how to read. The State did not discuss the substance of the statement.

The State then questioned Atkins about the testimony he gave at the trial of a codefendant also charged with the deceased's murder. At that trial, Atkins stated that two (not one) police officers beat him into giving the written statement. Atkins never filed a report against the police who allegedly beat him.

On cross-examination, defense counsel brought out the substance of an oral statement Atkins gave police on May 17, 1989. This was permitted after Atkins denied that he had given the police any information about the shooting. Atkins allegedly told police shortly after the shooting that he heard shots at the time the deceased was murdered, and that he was selling drugs for Jordan prior to the shooting when the deceased, armed with a .357 magnum revolver, approached him and robbed him of $50. He told Sidney, nicknamed "Sinbad," and Jordan about the robbery. Jordan obtained a .38-caliber handgun, and the three confronted the deceased. Atkins stayed behind Jordan and Sidney because he did not want to get caught in the cross-fire when Jordan shot the deceased. Jordan confronted the deceased about the robbery and slapped him across the face with the gun. Atkins then saw Jordan fire his weapon twice at the deceased. Atkins started to run and heard more shots fired. Atkins denied that he gave police this information.

Atkins was never charged with any offense in connection with the deceased's murder. According to Atkins, the police did not tell him he could be charged with the deceased's murder and at no time did they they force him to say that the Hoard brothers killed the deceased.

Atkins acknowledged a visit from a defense investigator while he was in Cook County jail, at which time Atkins was shown his written statement and then wrote on it, "This statement is not true. I did not read it before I signed it," affixed with his signature and the date of January 24, 1991. He acknowledged telling the investigator that he did not know who shot and killed the deceased, that he was in the area and heard several shots, that he was not selling drugs for anyone, and that in fact the police did tell him to say that the Hoards killed the deceased.

Mary Lewsader, a Chicago youth officer, testified for the State that she was present along with Atkins' mother at the time Atkins gave his written statement. She stated that Atkins was informed of his rights and voluntarily waived them. He then gave the police a written statement. After the assistant State's Attorney finished writing out Atkins' statement, he asked Atkins to read it and note where any corrections were to be made. Atkins began reading the statement, but the assistant State's Attorney took over reading aloud because Atkins was a slow reader. Lewsader stated that Atkins appeared to be in good health the night he gave his statement. He never complained about being mistreated by the police.

Over defense objection, the State distributed copies of Atkins' written statement and it was read aloud to the jury. Atkins stated that at about 12:30 a.m., he was selling cocaine when he was robbed of $50 and a bag of "cane" at gunpoint. He saw the man who robbed him walk towards the deceased. Atkins, who sold drugs for defendant, nicknamed "Crack," told defendant about the robbery. Defendant and his brother Sidney confronted the deceased, while Atkins lagged behind. Sidney had a .38-caliber revolver, and defendant had a gun that looked like an Uzi. Sidney accused the deceased of having set up the robbery. Defendant opened the deceased's shirt and asked Atkins if the gun the deceased was carrying was the same one that was used to rob him. Atkins responded affirmatively, but stated that the deceased was not the person who robbed him. Sinbad then hit the deceased with the gun and defendant shot at him. The deceased fell to the ground. According to Atkins, defendant shot the deceased three times. Jordan, defendant's friend, told defendant not to leave the deceased in that condition. Jordan then shot the deceased twice with his own gun, and Atkins ran home. He watched the shooting from about 25 feet away, but could hear and see clearly.

Officer James Treacy was qualified as an expert in firearms identification. He confirmed that the seven 9 millimeter cartridges recovered by police had been fired from a gun at some point, and that the

three .22-caliber bullets had never been fired. The nine-millimeter cartridges were fired from a semiautomatic or automatic weapon, but Treacy could not determine whether all seven were from the same gun. He also stated that an Uzi is a large semiautomatic pistol which predominantly fires a nine-millimeter bullet.

Treacy analyzed the bullets removed from the deceased's body and concluded that the five nine-millimeter bullets and bullet fragments and single .38-caliber bullet recovered could not have been fired from the same gun. On cross-examination, he confirmed that the .38-caliber bullet was flattened and could have become so by hitting the ground or concrete before it entered the deceased's body.

Assistant State's Attorney Patrick Campanelli testified regarding the taking of Atkins' written statement. He did not recommend that Atkins be charged with any drug-related offenses or with the deceased's murder. In his opinion, Atkins appeared to be in physically good condition when he arrived to take Atkins' statement. Atkins never complained of being mistreated by police.

Detective Ralph Vucko testified that on August 3, 1989, he and his partner drove to Zion, Illinois, where defendant was being held, to arrest him for the deceased's murder. Defendant was brought back to Chicago and was taken to an interview room where he was advised of his rights. Defendant informed Vucko that he knew of the deceased's murder but was not involved in it. He was in the area the night of the murder and heard gunshots, and when he arrived at the scene he saw the deceased lying on the ground. Vucko informed defendant that he had talked to several witnesses who implicated him in the shooting. The witnesses said defendant had an Uzi-type gun and shot the deceased several times.

Upon hearing this, defendant told Vucko that he was present at the time of the shooting, but was only holding a .25 automatic. He stated that he shot the deceased once in the leg. He was with Sidney and Jordan about a block away from the scene shortly before the shooting. Atkins walked up to defendant and told him that he had just been robbed and suspected that the deceased had been involved in the robbery. Jordan had a .38-caliber gun. The four walked about a block, where they found the deceased. Defendant approached the deceased and asked why he was taking money from people. The deceased told defendant to "get out of his face." Defendant then pulled out his .25-caliber pistol and started waving it around. As he did so, the gun fired one time as it was pointed between the deceased's legs but missed the deceased. Defendant then told the deceased, "See how easy it is." He continued to wave the gun at the deceased, and it

went off again, this time striking the deceased in the knee. The deceased started to hop around on one foot and eventually fell to the ground. Defendant started to walk away at that point. Jordan told defendant that they could not leave him in that condition, and defendant told Jordan he could do whatever he wanted. Defendant walked away and heard several more gunshots, but did not see who had fired the shots. Vucko told defendant that no .25-caliber bullets were found, but defendant insisted that he only had a .25-caliber pistol at the time of the shooting.

Defendant gave a written statement to Assistant State's Attorney Barbara Riley which was consistent with the statement he gave to Vucko. He told Riley that the deceased denied involvement in the robbery and that he did not see the deceased with a gun.

At the close of the State's case in chief, the trial court denied defendant's motion for a directed verdict. The defense then called its investigator, Mort Smith. Smith testified regarding a conversation he had with Atkins at Cook County jail on January 24, 1991. Smith showed Atkins the written statement he gave the assistant State's Attorney and a statement he orally gave police, and Atkins told Smith that neither of them was true. Atkins knew defendant, but did not see him shoot anyone. Atkins was in the area where the shooting occurred, but did not know who shot the deceased. The police yelled and beat him for several hours, telling him that they wanted to get the Hoards. According to Atkins, the police wrote out the statement and forced him to sign it. The police were going to charge him with the murder if he did not sign it. Smith prepared a statement in Atkins' presence recounting what Atkins told him.

On cross-examination, Smith added that Atkins also denied selling drugs for anyone on the night of the shooting. Smith acknowledged that defendant and Atkins were both being held in the jail prior to and at the time Smith spoke to Atkins. Further, according to Smith, Atkins read aloud the statement Smith prepared and stated it was accurate. He also read aloud the written statement prepared by assistant State's Attorney Campanelli. Over the State's objection, Atkins' statement to Smith was read to the jury for the limited purpose of impeaching Atkins' in-court testimony.

Detective Robert Kleinschmidt testified for defendant that he had a conversation with Atkins on May 17, 1989, regarding the shooting. This conversation was contained in his police report. Atkins told Kleinschmidt that he was at the scene, heard the shots, and later learned that the deceased had been shot. He also told Kleinschmidt that he was selling drugs for Jordan when he was robbed by the de-

ceased, who was armed with a .357 magnum revolver. Atkins told Sidney he had been robbed, and together they told Jordan about the robbery. Jordan obtained a .38-caliber handgun and told them he was "going to take care of" the deceased. The three returned together to the scene of the robbery, and Atkins "[hung] back about two car lengths" as Jordan and Sidney approached the deceased because he knew Jordan was going to shoot the deceased and "he didn't want to get caught in the cross-fire." Jordan confronted the deceased about the robbery and hit him in the face with the gun. Jordan then shot the deceased twice. Atkins ran and heard several more shots being fired. Atkins never mentioned defendant during this recounting of the incident.

On cross-examination, Kleinschmidt testified about a second oral statement Atkins gave him on May 18. Atkins told Kleinschmidt that he was selling drugs for defendant, not Jordan. Further, he stated that defendant had an Uzi, and Sinbad, rather than Jordan, had a .38-caliber handgun.

Defendant first contends that the trial court erred by refusing to instruct the jury as to the elements of involuntary manslaughter. He argues that there was sufficient evidence from which the jury could have concluded that he was guilty of the lesser offense of involuntary manslaughter instead of first degree murder.

The instructions at issue are Illinois Pattern Jury Instructions, Criminal, Nos. 7.07 and 7.08 (2d ed. 1981) (hereinafter IPI Criminal 2d). IPI Criminal 2d No. 7.07 states:

> "A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another."

IPI Criminal 2d No. 7.08, states:

> "To sustain the charge of involuntary manslaughter, the State must prove the following propositions:
>
> *First*: That the defendant performed the acts which caused the death of Jermaine Rhodes; and
>
> *Second*: That the defendant performed those acts recklessly; and
>
> *Third*: That those acts were likely to cause death or great bodily harm.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

In support of his contention that the involuntary manslaughter instructions should have been given, defendant points to his oral and written statements in which he stated that he only intended to scare the deceased when he waved his gun around, and that the gun discharged twice by accident, hitting the deceased once in the leg. This conduct, defendant argues, amounts to recklessness, not intent to kill or do great bodily harm.

The law is well settled that a defendant is entitled to an involuntary manslaughter instruction if there is slight evidence upon which that theory could be based. (*People v. Trotter* (1988), 178 Ill. App. 3d 292, 298, 533 N.E.2d 89, 92.) However, such an instruction should not be given if there is no evidence which would reduce the murder charge to manslaughter. (*Trotter*, 178 Ill. App. 3d at 298, 533 N.E.2d at 92.) In this case, we conclude that the involuntary manslaughter instructions were not warranted.

■ In order for defendant to have been found guilty of involuntary manslaughter, it must have been shown that he performed reckless acts which *caused the death of the deceased*. (Ill. Rev. Stat. 1987, ch. 38, par. 9—3(a); IPI Criminal 2d No. 7.08.) Even if this court were to believe defendant's version of the events and concede that his act of waving the gun in front of the deceased to scare him amounted to reckless conduct, we conclude, as did the trial court, that the resulting discharge of the gun into the deceased's leg was not the act which caused the deceased's death. Rather, the numerous gunshot wounds to the deceased's head and chest area were what caused his death. The sheer number and location of those wounds leads us to only one reasonable conclusion: that the act which caused the deceased's death, whether committed by defendant or one for whose conduct he is legally responsible, was not reckless, but intentional. An instruction for involuntary manslaughter is not warranted where the nature of the killing, shown by multiple wounds, reveals the inapplicability of the theory. *Trotter*, 178 Ill. App. 3d at 298, 533 N.E.2d at 92; *People v. Jones* (1987), 157 Ill. App. 3d 106, 112, 510 N.E.2d 116, 121.

Thus, the jury was properly left with the options of acquitting defendant or finding him guilty of first degree murder as a principal or under an accountability theory. There was ample evidence to support a conviction under either theory.

Defendant could have been convicted of murder by accountability under section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)), which states:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Our supreme court has construed section 5—2(c) as incorporating the "common-design rule." (See *People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29.) That rule provides, "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts." (*Kessler*, 57 Ill. 2d at 496-97, 315 N.E.2d at 32.) Thus, under this rule, an accomplice can be held accountable for murder even without a showing of an intent to kill.

Here, defendant's own oral and written statements reveal that he was engaged in a common criminal design with Sidney and Jordan when together they planned and attempted to retrieve from the deceased the money he allegedly took from Atkins. According to defendant, he and Jordan were both armed, and they, together with Sidney, sought out the deceased. When they found him, defendant asked why he was "stealing money from a 16-year-old." Defendant then started waving his pistol around and said, "See how easy it is." Immediately thereafter, the deceased was shot several times. Even though under defendant's scenario he did not fire the fatal shots or even intend to kill the deceased, under the common-design rule, his participation in the felonious scheme to rob the deceased makes him responsible for any consequences flowing therefrom, including the murder of the deceased. *People v. Terry* (1984), 99 Ill. 2d 508, 515, 460 N.E.2d 746, 749.

■ Defendant could also have been convicted of the deceased's murder as a principal. Atkins' written statement, which was admitted as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1), implicated defendant as a primary shooter. Atkins stated that he was selling drugs for defendant on the morning in question when he was robbed at gunpoint by a man who approached the deceased

immediately afterward. Atkins told defendant about the robbery, and they, along with defendant's brother, Sidney, confronted the deceased. According to Atkins, Sidney had a .38-caliber revolver and defendant had a gun that looked like an Uzi. Defendant subsequently shot the deceased three times, and his friend Jordan shot the deceased twice with his own gun.

Further, Detective Kleinschmidt, a defense witness, acknowledged on cross-examination that Atkins told him that on the morning in question he was selling drugs for defendant, not Jordan, as he had previously stated, and that defendant had an Uzi. Officer Treacy testified that the seven 9 millimeter cartridges which were recovered near the deceased's body had been fired from a semiautomatic or automatic weapon, and he confirmed that an Uzi is a large semiautomatic pistol which predominantly fires a nine-millimeter bullet. Five nine-millimeter bullets and bullet fragments were removed from the deceased's body.

In our view, the foregoing evidence would support a finding by the jury that defendant was a principal in the deceased's murder.

Defendant also contends that the trial court committed reversible error by refusing to give the "accomplice witness" instruction:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution.
>
> It should be carefully examined in light of the other evidence in the case." IPI Criminal 2d No. 3.17.

The accomplice witness instruction should be given "[i]f there is probable cause to believe [the witness] was guilty as a principal or as an accessory on the theory of accountability." (*People v. Henderson* (1990), 142 Ill. 2d 258, 314, 568 N.E.2d 1234, 1261.) "[T]he fact that the witness denies complicity in the crime does not eliminate the need to give the instruction if the totality of the circumstances shown by the record are sufficient to establish probable cause that the witness was accountable." (*People v. Carreon* (1987), 162 Ill. App. 3d 990, 993, 516 N.E.2d 372, 374.) Otherwise, " 'the purpose behind the accomplice testimony instruction would be emasculated if the instruction could be avoided by a witness' mere assertion of a noncriminal intent.' " *Carreon*, 162 Ill. App. 3d at 993-94, 516 N.E.2d at 374, quoting *People v. Buffington* (1977), 51 Ill. App. 3d 899, 903, 366 N.E.2d 1099, 1102.

Defendant argues that Atkins' written statement, which, as stated, is substantively admissible under section 115—10.1 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1), established probable cause to be-

lieve that Atkins was guilty of the deceased's murder under an accountability theory. Atkins stated that he was selling drugs for defendant when he was robbed at gunpoint by a man who then approached the deceased. Atkins told defendant about the robbery. Defendant and Sidney confronted the deceased, while Atkins lagged behind. Sidney and defendant were both armed; Atkins was not. Sidney told the deceased, "You set that up, you set that up." Defendant then opened the deceased's shirt and asked Atkins if the gun the deceased possessed was the same one that was used to rob him, to which Atkins said yes. Atkins told defendant, however, that the deceased was not the person who robbed him. Sidney then hit the deceased with the gun and defendant shot at him. Jordan shot the deceased twice.

■ We do not believe that the facts presented above would support a finding of probable cause to indict Atkins for the deceased's murder under an accountability theory. Although Atkins was present when the deceased was shot and did nothing to prevent his being shot, the law is clear that "mere presence or acquiescence is not sufficient to render a [person] accountable" for the acts of another. (*People v. Howard* (1991), 209 Ill. App. 3d 159, 184, 568 N.E.2d 56, 72.) "[T]o establish probable cause that someone was an accomplice there must be at least some evidence of other circumstances, other conduct, from which it can be inferred that the person approved of the offense and aided it by his mere presence." (*Henderson*, 142 Ill. 2d at 316, 568 N.E.2d at 1262.) Here, there was no such evidence. Although Atkins informed defendant, the man for whom he sold drugs, that he had been robbed and accompanied him in defendant's efforts to retrieve the money which had been taken, we find it significant that Atkins was unarmed and in fact told defendant prior to the shooting that the deceased was not the one who robbed him.

Even if Atkins could have been indicted for the offense, however, we do not believe that failure to give the instruction deprived the jury of essential guidance in its evaluation of the evidence. (See *People v. Dowd* (1981), 101 Ill. App. 3d 830, 428 N.E.2d 894.) The jury had the opportunity to hear defense counsel comment at length during closing argument about Atkins' incredibility as witnessed by his conflicting statements and uncooperativeness on the witness stand. The jury was also instructed generally as to its duty to evaluate the credibility of witnesses. If any error resulted from the failure to give the accomplice witness instruction, it was harmless. See *Howard*, 209 Ill. App. 3d 159, 568 N.E.2d 56.

Finally, defendant contends that he was deprived of a fair trial as a result of several improper remarks made by the State at trial.

■ Defendant first alleges that the State misrepresented the evidence when it stated in opening remarks and again in closing argument that defendant initially denied knowing anything about the murder. Although defense counsel timely objected to the prosecutor's remarks in opening statement, she failed to object during closing argument and did not raise this issue in the post-trial motion. Therefore, the issue is waived. *People v. Gacho* (1988), 122 Ill. 2d 221, 239, 522 N.E.2d 1146, 1154 ("The failure to raise an issue in a written motion for new trial generally constitutes waiver of that issue and it cannot be urged as a grounds for reversal on review"); *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

Moreover, contrary to defendant's contention, we do not find this case to be one in which the plain error doctrine should be invoked. That doctrine is applied only in limited cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. (*People v. Herrett* (1990), 137 Ill. 2d 195, 561 N.E.2d 1.) We do not consider the evidence in this case to be closely balanced. Nor do we believe that the prosecutor's remarks affected the jury's verdict. In his statements, defendant admitted that he, Sidney and Jordan together sought out the deceased to retrieve Atkins' money. He also admitted firing two shots at the deceased, if only to scare him. As we have previously stated, this evidence was more than sufficient to find defendant guilty of murder under a theory of accountability, and ample other evidence exists to support a finding of guilt as a principal. We decline to find plain error.

Defendant also argues that the trial court improperly sustained the State's objection to defense counsel's remarks in closing argument that the police were "looking for" and "wanted the Hoards." However, this issue was not specifically raised in the motion for a new trial. Issues not raised with *specificity* in the motion for a new trial are waived, in the absence of plain error. (*Enoch*, 122 Ill. 2d at 187, 522 N.E.2d at 1130.) As we have previously stated, we find no evidence of plain error.

Defendant next asserts that the State improperly shifted the burden of proof by commenting in rebuttal closing argument on defendant's failure to call Detective Kato. When the comments are placed in context, however, it becomes apparent that any error was invited.

During her closing argument, defense counsel stated:

"Detective Vuco [*sic*] is hiding something. And the State is hiding someone, Detective Kato. Vuco [*sic*] was the brains and

Kato was the brawn. *** I would ask you to consider the possibility that they did not call Detective Kato for the same reasons they didn't call the detectives who interrogated Tyrone Atkins. They want you to focus your attention simply on two things, the piece of paper and nothing else. That's not fair."

It was only after defense counsel raised the issue of Kato's failure to testify that the prosecutor made the following comments during rebuttal closing argument which defendant now cites as error on appeal:

"They [the defense] complain that we didn't call Detective Kato. *** [They] can walk up there as well as we can and ask for a subpoena. *** Do not be misled. They have no more or [sic] a difficult opportunity than Mr. Lavin and I have to bring anybody they want.

If they wanted you to hear what Detective Kato or any other detective said, they could have brought him down as we did. They did bring down Detective Kleinschmidt of the Area 4 Police Department to testify for them."

From the foregoing, it is apparent that defense counsel was arguing that Kato did not testify because he in fact beat Atkins' statement out of him. Pursuing this line of argument, defense counsel demanded that the State explain Kato's failure to testify. In response to this challenge, the State merely reminded the jurors of the power of compulsory process. Because the comments were invited, they cannot be relied upon as error on appeal. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 425, 539 N.E.2d 1172, 1190; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Moreover, if erroneous, the comments amounted only to harmless error.

Finally, defendant asserts that he was prejudiced by the following remark made by the prosecutor during closing argument:

"The defense attorney gets up here and says, after that statement on May 17, the police were looking for Brian Hoard. That's incorrect. If it's not a lie, it's at least incorrect."

The trial judge sustained defendant's objection and instructed the jury to disregard the statement. Although the comment was inappropriate, any error was cured by the trial court admonishing the jury to disregard it.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and GIANNIS, JJ., concur.